**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM ET AL., Plaintiff, | Case No. 1:18-cv-03021-RJS |
| vs. | CLASS ACTION |
| TELEFONAKTIEBOLAGET LM ERICSSON ET AL., Defendants. | AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| | DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 14

III. PARTIES AND OTHER KEY ACTORS ........ 15

A. Plaintiffs ........ 15

B. Defendants ........ 16

IV. CONTROL PERSON ALLEGATIONS ........ 17

V. SUBSTANTIVE ALLEGATIONS ........ 20

A. Overview of Ericsson's Business ........ 20

1. Ericsson's Evolving Reporting Structure ........ 22

2. Ericsson's Businesses ........ 25

(a) Ericsson's Network Rollout Contracts ........ 25

(b) Ericsson's Managed Services Business ........ 28

B. Ericsson Represents that It Complies with Accounting Standards ........ 31

1. Recognition of Expenses ........ 33

2. Recognition of Revenue ........ 34

C. Ericsson Fails to Adequately Account for Its Contracts ........ 37

1. Ericsson's Practice of Improperly Accounting for Costs ........ 37

2. Ericsson's Practice of Prematurely Recognizing Revenue ........ 48

D. Ericsson's Fraudulent Scheme Is Revealed ........ 50

1. July 17, 2016 – SvD Article Partially Reveals that Ericsson Was Prematurely Recognizing Revenue ........ 50

2. 1Q2017 – Partial Disclosure of Unprofitable Contracts ........ 51

3. 2Q2017 – Full Disclosure of Unprofitable Contracts ........ 57

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........ 63

A. Reporting on the Year 2013 .......... 63

B. Reporting on the Year 2014 .......... 69

C. Reporting on the Year 2015 .......... 74

D. Reporting on the Year 2016 & SvD Article Response .......... 78

1. April 21, 2016—Ericsson Publishes 1Q2016 Results .......... 78

2. July 18, 2016—Ericsson Publishes Response to the SvD Article .......... 80

3. July 19, 2016—Ericsson Publishes 2Q2016 Results .......... 81

4. October 21, 2016—Ericsson Publishes 3Q2016 Results .......... 83

5. January 26, 2017—Ericsson Publishes 4Q2016 Results .......... 83

6. March 3, 2017 and April 26, 2017—Ericsson Publishes 2016 Annual Report .......... 84

E. Disclosures of Provisions and 1Q2017 Results .......... 87

1. Initial Disclosure of Contract Provisions .......... 87

2. April 25, 2017—1Q2017 Financial Results .......... 89

F. Ericsson Mispresented Information Regarding Scoping and Thereby Assumed a Duty to Disclose Its Scoping and Revenue Recognition Practices .......... 91

G. Ericsson Had an Independent and Affirmative Obligation to Disclose Trends and Uncertainties in Its Forms 20-F During the Class Period .......... 92

VII. ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER .......... 93

A. The Fraud Was a Widespread and Pervasive Corporate Scheme Directed from the Highest Levels of Management .......... 94

B. Defendants Had Access to and Reviewed Information Concerning Ericsson's Long-Term Contracts .......... 96

C. The Magnitude of the Fraud and the Timing of the Provisions and Write-Downs Support Scienter .......... 96

D. The SvD Article and Response Demonstrate Defendants' Scienter .......... 97

E. The Misstatements Relate to Ericsson's Core Operations and Further Demonstrate Defendants' Scienter .......... 97

F. The SOX Certifications Support a Finding of Scienter ........................................ 98

VIII. LOSS CAUSATION ........................................................................................ 98

IX. APPLICATION OF THE PRESUMPTION OF RELIANCE ........................................ 100

X. NO SAFE HARBOR ........................................................................................ 101

XI. CLASS ACTION ALLEGATIONS ...................................................................... 102

COUNT I Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ............................................................... 105

COUNT II Violation of §20(a) of the Exchange Act Against the Individual Defendants ......... 106

XII. PRAYER FOR RELIEF ................................................................................ 108

XIII. JURY DEMAND ........................................................................................ 109

Lead Plaintiff Oklahoma Law Enforcement Retirement System ("Lead Plaintiff") and plaintiff Greater Pennsylvania Carpenters' Pension Fund ("Plaintiff," and together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of its counsel, which included, without limitation: (a) review and analysis of public filings made by defendant Telefonaktiebolaget LM Ericsson ("Ericsson" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and publications approved and/or disseminated by defendants Hans Vestberg, Börje E. Ekholm, Carl Mellander, Magnus Mandersson, and Jan Frykhammar (collectively, the "Individual Defendants") and Ericsson (together, with the Individual Defendants, the "Defendants"); (c) review of news articles and financial analyst reports; (d) interviews with former employees of Ericsson; and (e) review of publicly available data, including data made available through Bloomberg L.P. Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will be revealed after they have a reasonable opportunity to conduct discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all purchasers of the American Depositary Shares (the "ADS") of Ericsson between April 24, 2013 and July 17, 2017, inclusive (the "Class Period"), seeking to pursue remedies against Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2. Ericsson provides networking hardware and services to telecommunications companies, like cellular phone providers, around the world. At least two-thirds of its business involves providing services to customers through large, multi-year contracts. Due to this

reliance on long-term contracts, it was extremely important for Ericsson to provide investors with accurate information about its performance under those contracts, as well as the risks and uncertainties associated with them.

3. During the Class Period, Defendants orchestrated a fraudulent scheme to misrepresent Ericsson's true financial condition by inaccurately accounting for its long-term contracts and by making false statements regarding those contracts. When the truth was revealed, those who purchased Ericsson's ADS during the Class Period lost hundreds of millions of dollars.

4. While Defendants' fraud was not limited to any one of Ericsson's businesses, the misconduct alleged herein is most clearly illustrated with reference to the Company's Managed Services business. This business involved designing, building, and operating its customers' communications networks. During the Class Period, Ericsson operated networks with over a billion end-user subscribers, through more than 300 Managed Services contracts. By 2017, Managed Services contracts accounted for 12% of Ericsson's annual net sales.

5. In its 2015 Annual Report,[1] Ericsson explained that Managed Services projects typically have "lower profitability" during their initial phase, but then move on to the phase with "improved profitability." However, the report also stated that Ericsson had improved this business and "shortened the initial phases" and that about 75% of its contracts were in the optimization phase, which had "a beneficial effect on earnings." In its 2016 Annual Report, Ericsson informed investors, without qualification, that the pre-optimization phase lasts no more than 1.5 years and stated that these contracts "normally" last 5-7 years.

[1] Annual and periodic reports are referred to by the period over which they report. For example, Ericsson's 2015 Annual Report refers to the report covering the fiscal year that ended on December 31, 2015, which was published on April 4, 2016. Unless otherwise noted, references to annual reports refer to the Form 20-F filed with the SEC, and all of its exhibits, including the English-language version of the Company's Swedish annual report.

6. Ericsson also reported in its annual reports throughout the Class Period that it complied with International Financial Reporting Standards ("IFRS"), which requires the Company to "immediately" recognize a project's loss at the very point in time it was "probable" that total expected project costs would exceed total contract revenue. This rule is a conservative accounting principle that compliments, and extends beyond, the principle that (with certain exceptions) a company generally should account for expenses as they arise. Ericsson directly represented that "[t]he profitability of contracts is periodically assessed, and provisions for any estimated losses are made **immediately** when losses are probable." (Emphasis added).

7. Contrary to these representations—that Ericsson takes on contracts that are profitable through most of their life-cycle and that it immediately accounted for contractual losses—and unbeknownst to investors, the Company had amassed a portfolio of loss-making contracts during the Class Period. In 2017, the Company ultimately disclosed the troubled condition of its contracts—as well as the impact those "loss-leading" contracts would have on the Company—and former employees of Ericsson have explained the details of the Company's improper conduct. These former employees describe a scheme to avoid recognizing the true financial condition of Ericsson's long-term contracts that consisted of four wrongful activities.

8. First, Ericsson entered into negative-value contracts in order to keep up the appearance that its businesses were successful. One former employee, a Chief Operating Officer for the Managed Services business in Africa (FE 6, introduced below), was familiar with at least 24 long-term service contracts that were entered into with the understanding that they were going to lose money. He[2] explained that Ericsson did not care about the costs of

[2] All former employees are referred to herein using male pronouns, regardless of their actual gender.

these contracts because it entered into them solely to gain market share and that this practice was going on for years. Other former employees confirmed that they also were aware that Ericsson would enter into low or negative margin contracts. As explained by one former employee (FE 7, introduced below), Ericsson would often use loss-leader contracts as a strategy to pursue larger projects from the customer. That former employee detailed that the decision to enter into these contracts was made by Swedish headquarters. Significantly, Ericsson failed to publicly disclose its usual and customary practice of entering into loss-leader contracts, just as it failed to disclose to investors the other misconduct described below.

9. Second, Ericsson would purposefully agree to complete a project for a customer with advance knowledge that the scope of the project far exceeded the budgeted costs. The Company's improper scoping[3] practices involved accepting a "fixed price" for a project and offering the customer an "open-ended commitment." By scheduling costs for these contracts that did not reflect the actual scope of Ericsson's obligations, the Company dramatically understated the true costs of its projects—and, consequently, deferred recognizing the costs associated with those loss-making contracts and failed to disclose its true financial condition to investors.

10. This practice, which was not disclosed to investors, had an obvious and predictable effect on Ericsson's financial position and accounting. Because Ericsson chose not to "close the scope," to use the parlance of the Company's employees, its customer would repeatedly request additional services and the costs related to the contract would balloon. And because Ericsson had not baked the costs of these additional services into the "fixed price" of the contract, the contract would quickly become unprofitable, causing Ericsson's margins to

---

[3] "Scoping" is a term often used by Ericsson and its employees to refer to defining, within a contract, the scope of work that Ericsson would be required to perform under the agreement.

suffer. This was not a mistake that occurred in one or two contracts, but rather a conscious business strategy that permeated the Company's long-term contracts, causing massive losses when Defendants concluded the Company could not continue to shoulder such costs.

11. One example of these "open-ended commitment" contracts, where Ericsson chose not to "close the scope," involved the installation of telecommunication equipment for Verizon at Grand Central Terminal in New York. In 2012, Ericsson entered into the contract with a purchase price of roughly $7.5 million and with scheduled costs of about $5-6 million. By May 2017, the project had grown to $57 million in costs and by March of 2018, it had costs of roughly $157 million. The project initially involved repairing "leaking fibers," but the customer added an antenna repair component, then an antenna installation component, and finally, requested that Ericsson add an entirely new fiber-optic line. Because Ericsson left the scope of the contract open-ended, it was unable to collect additional fees to compensate for these costs. As one former employee (FE 1, introduced below) explained, Ericsson was not concerned with these costs because its goal was to win more of Verizon's business. This practice allowed Ericsson to remain highly competitive in securing new contracts because it created the impression for customers that the Company could provide far more work than the contract price reflected.

12. This practice was misleading because it disguised the true value of Ericsson's contracts on its books. Scheduling costs that did not reflect the true scope of the contract ensured that Ericsson was not adequately recognizing loss-making contracts immediately. Additionally, through this practice, Ericsson signed what were essentially loss-leading contracts without disclosing this fact. As explained below, this practice also meant that Ericsson was prematurely recognizing revenue.

13. Third, Ericsson improperly pushed project costs into future quarters, rather than accounting for them immediately. As one former employee (FE 1) explained, employees would roll costs into later quarters "simply to make numbers" and that this was "normal practice." He further explained that contracts with Verizon, one of Ericsson's largest customers, were "notorious" for having costs pushed into future quarters. Similarly, this former employee explained that it was common to push costs related to AT&T into the next quarter. He also observed Account Vice Presidents openly advocating for costs to be pushed out in meetings.

14. Fourth, Ericsson prematurely recognized revenue. As one former employee (FE 1) explained, Ericsson would manipulate its project milestones to prematurely claim revenue associated with those projects. For example, that former employee explained that in contracts with AT&T, Ericsson was required to complete certain project milestones before it could recognize revenue and Ericsson would get AT&T to sign off on the milestone, even when the task was not yet completed. In some cases, this went as far as putting equipment or hardware needed for the milestone "on the loading dock," so that Ericsson could falsely indicate the milestone was met. That former employee also explained that the Company would complete some of the project and then recognize revenue even though it was premature. This employee further explained that the Company would take in revenue too quickly and sometimes need to make reversal entries, if the customer ultimately cancelled the project. Ericsson's accounting system facilitated these practices—as another former employee (FE 8, introduced below) explained, employees could recognize revenue with "just a few keystrokes."

15. Ericsson also prematurely recognized revenue as a result of its improper accounting of project costs. For its long-term contracts, Ericsson supposedly recognized

revenue as a percent of project completion. Thus, for a fixed-price contract, Ericsson could claim a percentage of that fixed-price as revenue, based on the percentage of the project it had completed. Furthermore, under this system, Ericsson was generally supposed to calculate the completion percentage, by dividing costs-to-date by the costs it had scheduled as expected for the project. For example, if a project had costs-to-date of $10 million and scheduled costs of $100 million, Ericsson could claim that the project was 10% complete; and if that total revenue for the contract (as determined by the contract price) was $200 million, then Ericsson could recognize $20 million in revenue—since that is 10% of $200 million.

16. However, if Ericsson purposefully understated the amount of work it would actually need to complete in order to finish the project (by failing to "close the scope" of the project), this formula would result in a misleading representation of how much of the project had actually been completed. Using the Grand Central Terminal project as an example, as the project expanded—from repairing leaking cables, to repairing antennas, then to installing antennas, and finally to installing a new-optic line—costs dramatically increased from $5-6 million to $157 million. Thus, in a simplified model, when Ericsson performed its first $1 million of work, it would have claimed to be about 18% done, and recorded $1.44 million in revenue, as that would have been 18% of the $8 million contract price. However, Ericsson had completed less than 1% of the project's ultimate $157 million cost—and had Ericsson accurately documented the true scope of the project, it should have recognized about only $51,000 in revenue. Furthermore, Ericsson should have actually recognized the contract as loss-making and claimed the entirety of the losses at the time of signing. However, the conscious decision to improperly scope the project allowed the Company to count the contract as a profit-making contract with a mere $5-6 million scheduled in costs.

17. These improper practices occurred throughout Ericsson's long-term contracts. Former employees explain that Ericsson had adopted an aggressive approach to acquiring service contracts with its customers. For example, Ericsson launched an internal campaign to promote more risk-seeking behavior with shirts reading "Do ~~Not~~ Feed the Gorilla."[4] A picture of the front and back of these shirts, provided by a former employee (FE 5, introduced below), is below:







18. Former employees of Ericsson explained that, under this risk-taking approach—which had the approval of Ericsson's Head of North America—employees understood that "everything goes," "all is forgiven," that they needed to "make it work" (rather than revising project expectations), that they should not "worry about" cost overruns, and that they could "just sell and make it believable later."

[4] This slogan appears to be a joke about removing a warning sign that had been urging people not to engage in a risky activity—*e.g.*, a zoo may have a sign warning "do not feed the gorilla"—and the apparent joke is that Ericsson is encouraging its employees to do just that.

19. Throughout the Class Period, Defendants made various formal representations that they were closely monitoring Ericsson's business in such a way that would have alerted them to these improper practices. For example, in their certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants represented that the Company had sufficient internal controls to "ensure that material information relating to the Company" was made known to them. Defendants also signed documents stating that the Company's public filings provided a fair view of its financial position, and stated that they periodically reviewed the profitability of Ericsson's contracts. Defendants themselves also admitted that they reviewed contracts and costs associated with them quarterly to make sure provisions were being taken when appropriate. Additionally, the former employees make clear that these issues were wide-reaching and well known within Ericsson: by their accounts, there were excel sheets tracking overruns, employees dedicated to visiting the problematic Managed Services projects, "report cards" on profit and loss performance on service contracts, a report tracking efficiencies and costs that was circulated quarterly, and regional reports on contract performance.

20. The truth about Ericsson's fraudulent scheme began to emerge when, on July 17, 2016, the major Swedish publication Svenska Dagbladet ("SvD") published an article (the "SvD Article") reporting that concerns were growing internally at Ericsson due to the Company's use of aggressive accounting techniques. This article quoted insiders at Ericsson who said that the Company had been prematurely recognizing revenue to maintain its "reported" sales numbers, and that due to this, the "barns" were "virtually empty" because "most of the long-term contracts have already been accounted for as sales." In other words, the article alleged that Ericsson had projects that required continued work but were "virtually empty," because Ericsson had already booked the revenue. Booking this revenue was

problematic because Ericsson had not actually performed the work under the contract sufficient to justify revenue recognition. The result of this practice, like all premature revenue recognition schemes, was to artificially inflate Ericsson's financial performance at earlier points in time, such that, at a later point in time, its reported position would deflate—as it would be forced to perform its obligations under the contracts without bringing in new revenue.

21. The following day, Ericsson published a response to this article, denying the claims and reiterating several aspects of its accounting practices. The SvD article was published in Swedish on a Sunday. On Monday, July 18, 2016, Ericsson ADS decreased from $7.77 to $7.54 per share (an almost 3% drop), and on Tuesday, July 19, 2016, the ADS decreased to $7.08 per share (an additional 6.1% drop)—on extraordinarily high volume of nearly 12 million shares trading.

22. Following the publication of this article, Defendants continued to falsely claim that Ericsson complied with accounting standards, continued to incorporate false numbers into the Company's financial statements, continued to misleadingly represent that the Company's contracts were successful and profitable, and continued to conceal their fraudulent scheme.

23. On March 28, 2017, Ericsson began to reveal the effects of its fraudulent scheme to the market. Specifically, Ericsson issued a press release disclosing that "provisions of an estimated SEK 7-9 b. will be required in Q1, triggered by recent negative developments related to certain large customer projects." In U.S. dollars, this provision was between $900 million and $1.16 billion.[5] In this context, a provision is the same as a write-down and the total

[5] Throughout this complaint, figures in Swedish Krona ("SEK") are often converted to U.S. dollars for ease of reference at an exchange rate of 7.78 SEK to 1 U.S. dollar. This is the combined average of the average exchange rates listed in Ericsson's Annual Report for the years 2013-2017. The rates were 6.52, 6.89, 8.39, 8.56, 8.53 Swedish Krona to 1 U.S. dollar in 2013, 2014, 2015, 2016, 2017 respectively.

amount to be written down was hugely significant in comparison to Ericsson's operations—indeed, even at the lower estimate of $900 million, it was more than three times greater than the Company's entire 2016 profit! The need for this provision partially revealed Ericsson's faulty accounting, which rendered its reported financials—including metrics such as net sales, cost of sales, gross income, gross margin, net income and profit margins—false and materially misleading. This news—that Ericsson was taking a substantial provision—caused the trading price of the Company's ADS to drop by $0.24 (3.59%), to close on March 28, 2017 at $6.45 per share—on unusually high volume of more than 7 million shares trading.

24. Later that day, Defendants Ekholm and Mellander reassured investors during a conference call that Defendant Ekholm and the Company's management had "reviewed [the] contract portfolio and project portfolio" and this provision related only to "specific and certain of the large ones." Defendant Ekholm further clarified that the provisions related to a "few" contracts. And during an earlier call, also held that day, he confirmed a leading question indicating that these provisions did not reflect a "structural problem" with its business, and thereby continued to assure investors this was a limited and contained incident.

25. On April 25, 2017, in its results for 1Q2017, Ericsson officially announced the previously forecasted provision at a value of SEK 8.4 billion ($1.08 billion US). Ericsson continued to euphemistically frame these provisions in terms of "recent negative developments," but during the related conference calls, Defendants Ekholm and Mellander clarified that there was no extrinsic cause (*e.g.*, rising commodity prices) behind these numbers. For example, when an analyst asked if the need for these provisions was "an engineering issue" or an issue with what the "salesman promised," Defendant Ekholm's reply focused on scoping, stating "it's more our old ability to scope these projects." Similarly,

Defendant Mellander answered a question about the cause of the provisions by stating that "when it comes to scoping, we have learned a lot." And when an analyst prodded, stating that "it sounds like less than a change in the market or eroding market profile and more just a learning curve on how to do these projects and how to scope them better," Defendant Ekholm responded: "That's correct."

26. Unsurprisingly, analysts responded negatively to this news. For example, on March 29, 2017, Liberum stated that the need to take this provision "raises questions about Ericsson's internal controls and bidding processes." Analysts from Kepler Cheuvreux referred to "weaker-than-expected results globally in Q1 with very large one-offs, including a Jumbo SEK8.4bn provision (linked to massive over-runs in services contracts)."

27. Furthermore, during the April 25, 2017 conference call, Defendants continued to indicate that these issues were limited in breadth—saying they related only to "certain specific customer projects." Thus, Defendant Mellander said "It's a limited number of projects." Given Defendants' assurances that these issues were of limited breadth, analysts believed that the provisions taken meant that these issues had been resolved. For example, in its report on May 2, 2017, Liberum stated: "The IT transformation projects for which provisions were taken in Q1 are likely to have been putting pressure on profitability for many quarters. By taking provisions . . . these headwinds to the P&L are likely to have been removed."

28. Finally, on July 18, 2017, Ericsson revealed the full truth to the market—that the problems were in fact far-reaching, contrary to its previous assertions. Through its 2Q2017 results and related conference calls, Ericsson disclosed the vast extent of the problem. Defendants identified 42 loss-making Managed Services contracts, which it was going to "exit,

renegotiate, or transform," and provided a risk estimate of SEK 3-5 billion ($386-643 million U.S. dollars), which attempted to quantify the expected financial impact of such contracts. Ericsson made this risk estimate in addition to the previously announced provision of roughly $1.08 billion U.S. dollars—raising the total size of the taken or estimated provisions to $1.46-1.72 billion. The magnitude of these write-downs substantiates the testimony of Ericsson's former employees: the Company was not properly accounting for the losses associated with its contracts, as those losses arose.

29. Analysts were stunned by this revelation. One asked for "color on what happened," questioning whether "so many of your contracts have changed so radically that you must undertake such a large program of renegotiation[.]" Defendant Ekholm's response once again recognized the role that improper scoping played in the situation: "we could have scoped the contract better." Another asked "what has happened over the last few months to result in such a significant change?"—and then added, that it "doesn't seem as though the market has changed that much in the last few months, it's presumably contract specific." Defendant Mellander's response asserted that the new disclosures were the result of Ericsson coming "much further [sic] into the analysis" since the first quarter.

30. On this news, Ericsson's ADS fell by $1.21, or 16.62%, to close at $6.07 per share on July 18, 2017. At this point, investors learned the full truth: that Ericsson had been improperly accounting for its costs. There was simply no way that Ericsson could have been properly disclosing loss-making contracts "immediately" (as per the accounting rules) given its need to make such large provisions. Furthermore, Ericsson had clearly deceived investors by assuring them in 1Q2017 that management had "reviewed [the] contract portfolio and project portfolio" and that the problems were limited—as indicated by Defendant Ekholm's admission

in 2Q2017 that the Company would need to "exit, renegotiate, or transform" additional contracts.

31. Analyst commentary in reaction to this news was bleak. Clearly frustrated, a July 18, 2017 analyst report from Deutsche Bank stated that Ericsson missed "[a]lmost every metric" and was "expecting additional provisions for problematic contracts," before lamenting: "Ericsson continues to underperform while claiming that the period of share losses for the company is over." Referring to the problems with the contracts, Liberum's July 19, 2017 report explained that the issues seemed to be "wide ranging," and concluded that "[w]hile such issues can come up in one or two projects for any company, the fact that it involves so many projects over such a long time points to more deep rooted structural problems in our opinion. . . . We believe such negative impacts on projects may recur in future."

32. As a result of Defendants' fraudulent scheme, Plaintiffs and the Class (defined below) suffered hundreds of millions of dollars in losses.

## II. JURISDICTION AND VENUE

33. The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

34. This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331. Defendants engaged in a scheme that violated United States securities law. In doing so, Defendants engaged in conduct that was directed toward the United States. Ericsson registered its ADS with the SEC pursuant to Section 12(b) of the Exchange Act and these securities traded on the Nasdaq Stock Market ("NASDAQ").

35. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Ericsson transacts business in this District, and the Company's ADS trades in this District on the NASDAQ in New York.

36. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES AND OTHER KEY ACTORS

### A. Plaintiffs

37. Lead Plaintiff administers the retirement, survivor retirement and medical benefits for members of the law enforcement profession of the state of Oklahoma. Lead Plaintiff has more than $900 million in assets under management. As set forth in its Certification previously filed in this action, which is incorporated by reference herein, Lead Plaintiff acquired thousands of Ericsson ADS and incurred substantial losses as a result of the fraudulent scheme alleged herein.

38. Plaintiff is a trustee-administered, multi-employer, defined benefit pension plan for carpenters in Pennsylvania. Plaintiff has more than $800 million in assets under management. As set forth in its Certification previously filed in this action, which is incorporated by reference herein, Plaintiff acquired thousands of Ericsson ADS and incurred substantial losses as a result of the fraudulent scheme alleged herein.

**B. Defendants**

39. Defendant Ericsson is a Swedish limited liability company, organized under the Swedish Companies Act, with its principal executive offices located in Stockholm, Sweden. The Company's ADS are listed on the NASDAQ.

40. Throughout the Class Period, Ericsson listed two classes of stock on Nasdaq Stockholm: Class A and Class B. The main difference between these two classes is that Class A shares are entitled to one vote per share and Class B shares are entitled to one-tenth of one vote per share. These two classes of stock have the same rights to assets, earnings, and dividends.

41. In the United States, the Class B shares are listed on the NASDAQ in the form of ADS under the ticker symbol "ERIC." The ADS program is sponsored by Ericsson and, through this program, Ericsson has deposited Class B shares with Deutsche Bank Trust Company America, located at 60 Wall Street, New York, New York 10005. Holders of Ericsson's ADS can redeem their ADS interests for underlying Class B shares.

42. The ADS are registered with the SEC pursuant to Section 12(b) of the Exchange Act. Among other filings, Ericsson files annual, periodical and current reports with the SEC. These filings primarily report financial data in SEK. As noted above, figures in SEK are often converted to U.S. dollars herein for ease of reference at an exchange rate of 7.78 SEK to 1 U.S. dollar.

43. Defendant Vestberg served as President and Chief Executive Officer ("CEO") and a Board Member of Ericsson from January 1, 2010, to July 25, 2016. Prior to serving as CEO, he held various positions at Ericsson including the role of Chief Financial Officer ("CFO"), Head of Group Function Finance, Head of the Global Services segment, and Head of Finance and Control in the United States. He started with Ericsson in 1988.

44. Defendant Frykhammar served as Chief Financial Officer ("CFO") of Ericsson prior to July 25, 2016 and as acting CEO between July 25, 2016 and January 15, 2017. After he was replaced as CEO, Defendant Frykhammar continued serving as an Executive Vice President of the Company until November 7, 2017.

45. Defendant Ekholm has served as President and CEO of Ericsson since January 16, 2017. He has served as a Board Member of Ericsson since 2006.

46. Defendant Mellander served as acting CFO from July 25, 2016 through March 31, 2017, and has served as CFO since April 1, 2017. He previously held various positions within Ericsson's finance and business control units, including Vice President and Group Treasurer and Head of Finance in the Western and Central Europe region.

47. Defendant Mandersson served as Executive Vice President ("EVP") and head of the Global Services segment at all relevant times and as Advisor to the CEO from July 1, 2016, through November 7, 2017.

48. The changing roles of Ericsson's management can be summarized as follows. On July 25, 2016, Ericsson announced that its CEO, Defendant Vestberg, was stepping down immediately. Ericsson appointed Defendant Frykhammar to move from the role of CFO to serve as acting CEO, and Defendant Mellander took over as acting CFO. On January 16, 2017, Defendant Ekholm took control as Ericsson's CEO and Defendant Frykhammar was made Executive Vice President.

## IV. CONTROL PERSON ALLEGATIONS

49. The Individual Defendants, by virtue of their high-level positions at Ericsson, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial

statements, and financial condition, as alleged herein. As set forth herein, the materially misstated information conveyed to the public was the result of their actions.

50. Defendant Vestberg exercised considerable control over Ericsson as President, CEO, and Board Member of Ericsson from January 1, 2010 to July 25, 2016. As detailed throughout, he made public statements on behalf of the Company in various public filings with the SEC during the Class Period and during earnings calls with financial analysts covering Ericsson. For example, he signed Ericsson's 2015 Swedish Annual report and the beginning of that report contained a letter signed by him. He also signed a certification as an officer of Ericsson pursuant to SOX as part of Ericsson's 2015 Annual Report filing.

51. Defendant Frykhammar exercised considerable control over Ericsson as CFO of Ericsson during the period prior to July 25, 2016 and acting CEO between July 25, 2016 and January 15, 2017. As detailed herein, he made public statements on behalf of the Company in various public filings with the SEC. For example, on October 21, 2016, a letter attributed to him was included at the beginning of Ericsson's 3Q2016 quarterly report.

52. Defendant Ekholm exercised considerable control over Ericsson through his service on Ericsson's Board beginning in 2006 and through his service as President and CEO since January 16, 2017. As detailed herein, he made public statements on behalf of the Company in various public filings with the SEC. For example, he signed Ericsson's 2016 Swedish Annual report and the beginning of that report contained a letter signed by him. He also made statements on behalf of Ericsson to financial analysts during conference calls, such as during the calls on March 28, 2017, discussed herein. He also signed a certification as an officer of Ericsson pursuant to SOX as part of Ericsson's 2016 Annual Report filing.

53. Defendant Mellander exercised considerable control over Ericsson through his role as Ericsson's acting CFO from July 25, 2016 through March 31, 2017, and then through his role as CFO starting on April 1, 2017. Prior to July 25, 2016, he exercised considerable control through various other executive positions including as Vice President and Group Treasurer and Head of Finance in Region Western and Central Europe. He also made statements on behalf of Ericsson to financial analysts during conference calls, such as during the calls on March 28, 2017, discussed herein. He also signed a certification as an officer of Ericsson pursuant to SOX as part of Ericsson's 2016 Annual Report filing.

54. Defendant Mandersson exercised considerable control over Ericsson through his role as Advisor to the CEO from July 1, 2016 through November 7, 2017 and, throughout the entire Class Period, through his role as Head of Segment Global Services.

55. The Individual Defendants, as senior executive officers and directors of Ericsson, a publicly held company whose ADS was, and is, registered with the SEC pursuant to the Exchange Act, and whose ADS was, and is, traded on the NASDAQ, and governed by the federal securities laws, each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, so that the market prices of Ericsson's publicly-traded ADS would be based on accurate information. The Individual Defendants violated these requirements and obligations during the Class Period.

56. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of Ericsson, were able to, and did, control the content of the SEC filings, press releases, and other public statements issued by Ericsson during the Class Period. They were provided with copies of statements at issue in this action before they were

made available to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements detailed herein.

57. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of Ericsson, also had access to the adverse undisclosed information about Ericsson's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Ericsson materially false and misleading.

58. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Ericsson's ADS by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme and course of conduct: deceived the investing public about the true financial condition of Ericsson and in particular, the status of many of its long-term contracts, and caused Plaintiffs and members of the Class to purchase Ericsson's ADS at artificially inflated prices.

## V. SUBSTANTIVE ALLEGATIONS

### A. Overview of Ericsson's Business

59. Ericsson provides computer networking hardware, software, and related services to telecommunications companies around the world. While the Company is over 140 years old, it has transformed dramatically over the past two decades. Most notably, it has shifted from selling hardware to providing services to customers. In 2015, for example, it

discontinued its business of selling communication modems entirely, and, in that year, approximately two-thirds of its business was related to services and software.[6] Most of its business involves providing services to its clients related to large communication technology projects. Thus, while Ericsson is not a consumer-facing internet or mobile phone company, as of its 2015 Annual Report, over 40 percent of the world's mobile traffic was carried over its networks.

60. While Ericsson's main corporate officers are located in Stockholm, Sweden, the Company does business in more than 180 countries. The following chart shows Ericsson's net sales in various regions, according to its 2017 Annual Report:

| Region | Net Sales |
|---|---|
| Europe & Latin America | 28% |
| North America | 25% |
| South East Asia, Oceana, India | 15% |
| Middle East & Africa | 12% |
| North East Asia | 12% |
| Other (*e.g.*, IP licensing royalties) | 8% |

61. The United States was, by a wide margin, its most important individual country. In its 2017 Annual report, Ericsson reported that the United States produced the most net revenue of any one nation, outperforming China by 3.5 times and contributing more than China and the European Union combined. In the United States, Ericsson's largest and most significant competitor is Nokia.

62. The following chart shows Ericsson's reported financial condition during the Class Period:

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Net Sales** | $29.22 | $29.30 | $31.73 | $28.61 | $25.87 |
| **Cost of Sales** | -$19.41 | -$18.71 | -$20.71 | -$20.08 | -$20.15 |

6 Ericsson's non-services businesses include hardware sales and IP licensing.

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Gross Income** | $9.81 | $10.59 | $11.03 | $8.53 | $5.72 |
| **Operating** | -$7.52 | -$8.15 | -$8.24 | -$7.78 | -$9.07 |
| **Net Income** | $1.56 | $1.43 | $1.76 | $0.25 | -$4.51 |
| *All figures in billions of U.S. dollars.* | | | | | |

63. From 2015 to 2017, Ericsson's net income collapsed. Specifically, the Company went from almost $1.76 billion dollars of profit in 2015, to nearly break-even numbers in 2016, to a dramatic $4.51 billion in losses in 2017. As discussed throughout this Complaint, this declining reported financial performance was exacerbated by a fraudulent scheme to improperly account for costs and to prematurely recognize revenue.

**1. Ericsson's Evolving Reporting Structure**

64. Throughout the Class Period, Ericsson's reporting structure went through several changes.

65. From its 2013 Annual Report to its 2015 Annual Report, Ericsson reported three business segments: Networks, Global Services, and Support Solutions.

66. The Networks segment was Ericsson's largest division by net sales in 2015. The segment provided products and services for mobile and fixed communications. The main driver of business within the Networks segment was mobile network development. Through this business, Ericsson assisted cellular providers, such as Verizon and AT&T, in expanding their coverage networks and expanding the capacity of their existent networks. Much of this work involved physical hardware build-out at various sites, as well as pushing out software to the Company's clients.

67. The Global Services segment housed Ericsson's professional services business, including Network Rollout ("NRO") and Managed Services. Through the Managed Services business, Ericsson operated and developed networks for telecommunications companies and

other clients. Whether a contract fell within a given segment appears to have been largely dependent on whether Ericsson was primarily providing hardware (leading to classification as a "Networks" project) or offering services (leading to classification as a "Global Services" project). Thus, the networks Ericsson managed for its customers through the Managed Services division relied heavily on Ericsson's equipment, but typically more than 50% of a given customer's network's equipment was supplied by other vendors.

68. Ericsson's smallest segment was called Support Services. This segment provided software-based business solutions for companies, such as television and media firms. Activities in this segment included consulting, application development, and internet technology managed services. In some sense, this was an "other" category for Ericsson's businesses that did not fit into either of the two larger reporting segments.

69. Starting on July 1, 2016, Ericsson implemented organizational changes to its reporting structure. These changes went into effect, for purposes of financial reporting, during fiscal year 2017. Through this transformation, Ericsson divided its Global Services segment across its Networks segment and a newly-created segment called "IT & Cloud." As part of this split, the Networks division came to operate the portion of Ericsson's "Managed Services" business that related to telecommunication companies, and the IT & Cloud segment would manage the portion of "Managed Services" that related to non-telecommunication IT projects. Ericsson also renamed its "Support Solutions" segment to "Media."

70. On March 28, 2017, Ericsson reported that it was, once again, restructuring its reporting segments. The new reporting structure would have three segments: Networks, Digital Services, and Managed Services. However, it would also now utilize a segment called "other," which included several of Ericsson's smaller businesses. Notwithstanding this

change, Ericsson's first quarter financial results (published April 25, 2017) and its second quarter financial results (July 18, 2017) did not adopt this new reporting structure. The Company's 2017 Annual Report, however, utilized the new reporting structure.

71. The following chart summarizes these developments as of various points in time. It is sorted by the publication date of each event, rather than by reporting period:

| **Announcement** | **Reporting Segments** |
|---|---|
| 2013 Annual Report<br>(Swedish Report on March 13, 2014)<br>(20-F on April 8, 2014) | Networks: 51.8% of net sales<br>Global Services: 42.9% of net sales<br>Support Services: 5.4% of net sales |
| 2014 Annual Report<br>(Swedish Report on March 6, 2015)<br>(20-F on March 31, 2015) | Networks: 51.5% of net sales<br>Global Services: 42.8% of net sales<br>Support Services: 5.6% of net sales |
| 2015 Annual Report<br>(Swedish Report on March 7, 2016)<br>(20-F on April 4, 2016) | Networks: 50.1% of net sales<br>Global Services: 43.7% of net sales<br>Support Services: 6.1% of net sales |
| Announcement of New Segments<br>(Press Release on April 21, 2016) | Networks<br>IT & Cloud<br>Media |
| 2016 Annual Report<br>(Swedish Report on March 3, 2017)<br>(20-F on April 26, 2017) | Networks: 48.7% of net sales<br>Global Services: 45.7% of net sales<br>Support Services: 5.6% of net sales |
| Announcement of New Segments<br>(Press Release on March 28, 2017) | Networks<br>Digital Services<br>Managed Services<br>Other |
| 1Q2017 Results<br>(6-K on April 25, 2017) | Networks: 75.2% of net sales<br>IT & Cloud: 20.5% of net sales<br>Media: 4.3% of net sales |
| 2Q2017 Results<br>(6-K on July 18, 2017) | Networks: 73.7% of net sales<br>IT & Cloud: 21.8% of net sales<br>Media: 4.4% of net sales |
| 2017 Annual Report<br>(Swedish Report on March 2, 2018)<br>(20-F on March 27, 2018) | Networks: 64% of net sales<br>Digital Services: 20% of net sales<br>Managed Services: 12% of net sales<br>Other: 4% of net sales |

**2. Ericsson's Businesses**

72. The fraud alleged herein relates to Ericsson's long-term contracts. In its 2014-2016 Annual Reports, the Company stated that it "derives most of its sales from large, multi-year agreements." Ericsson's fraudulent conduct was not limited to any one reporting Segment or any specific type of contract. However, for purposes of illustrating the misconduct at issue, two of Ericsson's businesses involved in this fraudulent conduct are detailed below.

**(a) Ericsson's Network Rollout Contracts**

73. Ericsson's public reporting explains the NRO business as an aspect of the larger activity of building network coverage for telecommunication companies. For example, Ericsson's 2015 Annual Report explains that when Ericsson "builds network coverage there is a large share of hardware, and the project often includes network rollout services." Contracts for NRO relate to "network coverage build outs and [are] closely connected to the business of Radio, Core and Transmission" and often involve "building network coverage across one or more geographical areas."

74. In a brochure published on Ericsson's website, the Company explains its NRO business as providing customers with "agile and reliable" network "deployment." More specifically, Ericsson boasts that it assists its customers by providing "[a]chievable deployment timelines through supply chain management" and "[e]fficient and dedicated project management." According to its website, Ericsson "provides operators with the most efficient ways of deploying Mobile Broadband, Packet Transport and Transmission networks, while ensuring a seamless and predictable user experience."

75. Network rollout contracts are typically long projects. For example, on September 2, 2015, Ericsson announced a four-year contract to expand the mobile data network for the company Bharti Airtel across India. And news articles reported that, as part of

the project, Ericsson would build a manufacturing plant in India to assist in manufacturing transmission and microwave products.

76. The business also changed to track the evolutions of technology within the telecommunication industry. For example, in 2015, Ericsson's business related to "network coverage" was driven by the "rollout" of a particular generation of mobile data technology called LTE, which Ericsson described as "the evolutionary step of mobile technology . . . allowing data rate[s] above 100 Mbps."

77. To summarize, the NRO business showed Net Sales and Operating Margin as follows throughout 2015 and 2016. Specific numbers are not available for 2017.

| | **2013** | **2014** | **2015** | **2016** |
|---|---|---|---|---|
| **NRO Net Sales** | $4.0 | $3.4 | $3.2 | $3.4 |
| **Percent of Total Net Sales** | 14% | 12% | 11% | 11% |
| **Operating Margin** | 5% | -2% | -5% | -8% |
| **Source** | 4Q2014 Report | | 4Q2016 Report | |
| *All figures in billions of U.S. dollars.* | | | | |

78. As this table shows, the NRO business declined slightly as a percentage of Ericsson's overall business during the period—decreasing from 14% to 11% of net sales. This corresponded with a general decline in net sales produced by the NRO business—from $4.0 billion to $3.4 billion. However, the really striking change is a collapse in the business' operating margin: the NRO business went from generating 5% positive returns to 8% negative returns in the span of just a few years.

79. Despite these negative developments in the businesses' margins, Ericsson guided in its 2015 Annual Report that it had undertaken "modernization projects" which were now close to complete, and that through these projects, it has "made progress in its efforts to improve the profitability of network rollout services and industrialize the business." It also

stated that "[t]he effort to restore Network Rollout to a sustainable profitable business progressed well." These statements were previewed throughout the year in Ericsson's quarterly reports. For example, in 1Q2015, Ericsson stated that there was "continued good progress in returning the Network Rollout business to profitability." The 2Q2015 report stated that operating margin improvements were "driven by increased sales in Professional Services and reduced losses in Network Rollout." The 3Q2015 report described "improved income in Network Rollout" and stated that the work "to restore Network Rollout to a sustainable profitable business continues." In large-font, at the start of Ericsson's 4Q2015 results, Defendant Vestberg stated that "Network Rollout continued on its path to sustainable profitability."

80. As Ericsson moved into 2016, its 1Q results stated that the Global Services segment had a "challenging quarter partly due to lower mobile broadband coverage activities," and that this "temporarily" resulted in "larger losses in Network Rollout." The results showed that operating margin for the NRO business had decreased from -7% to -13%. In its 2Q results, Ericsson told investors that "[l]osses in Network Rollout have been significantly reduced," and operating margin had improved to -3%. In the third quarter, operating margin fell to -7%, which Ericsson said was "partly due to increased costs in a few specific projects in emerging markets." The year ended with Ericsson posting operating margins of -8% for the NRO business, though the 4Q results stated that this was "mainly due to increased costs and negative effects from a few contracts in emerging markets." In other words, Ericsson assured investors the quarter was an aberration rather than a harbinger.

81. In 2017, Ericsson stopped reporting its NRO business as a line item in its quarterly and annual reports. Instead, Ericsson reported the financial results of the business as

part of its reconfigured "Networks" segment as opposed to the "Global Services" segment. However, the members of Ericsson's management stated in a March 28, 2017 press release that they would "target" the Network Rollout business on Ericsson's network portfolio with the "ambition" to optimize its product, and assured investors that the "work to improve profitability in this area will be further sharpened."

**(b) Ericsson's Managed Services Business**

82. As of its 2015 Annual Report, Ericsson operated its Managed Services business as a component of its Global Services segment, but typically disclosed information relating to the business as a line-item in its financial statements broken-out as a sub-component of the "Professional Services" business. Through this business, Ericsson operated communications networks for various customers, such as telecommunications companies. The 2015 Annual Report further explained that "Managed Services include designing, building, operating and managing day-to-day network operations, with a focus on network performance and customer experience." That year, customer networks employing Ericsson's Managed Services division ultimately had more than 1 billion end-user subscribers.

83. The Managed Services business depended on long-term contracts that lasted multiple years. As Ericsson explained in its 2015 and 2016 Annual Reports, and as the Company similarly described in its 2014 Annual Report:

> The Managed Services business model includes three phases of which the initial phase, the transition, is coupled with lower profitability, as it involves up-front costs when staff and expertise are transferred from the customer to Ericsson. In the second phase, the transformation, Ericsson introduces its global processes, methods and tools and implements a global delivery model. In the third phase, Ericsson upsells and focuses on optimization and industrialization by simplifying, implementing and consolidating resources, processes, methods and tools to allow for improved profitability.

84. Ericsson further clarified that it has a "good balance of contracts in the transition, transformation and optimization phases" and more specifically noted that about 75% of its contracts are in the optimization phase. Without qualification, Ericsson explained that Contracts in the optimization phase have a "beneficial effect on earnings and cash flow."

85. The Company had roughly 300 Managed Services contracts underway in 2015. It boasted that "over time, the Company has advanced on the learning curve, which means that global synergies can be obtained, and thereby the initial phases can be shortened," and that this "limits the negative impact on cash flow in the transition phase when entering into new contracts."

86. In 2015, on top of these highly positive statements about the condition of the Managed Services business, Ericsson also spoke positively about the growth and development of this business, explaining that it had signed 101 new Managed Services contracts. Thus, the 2015 Annual Report explained that "[s]ales in Managed Services grew by 17% and the number of signed contracts increased by more than 40% compared with 2014." In 2015, Ericsson reported an "operating margin" of 8% from its Global Services segment, which at that time housed Managed Services.

87. To explain the life cycle of a Managed Services contract—and, in particular, its "current contract mix"—Ericsson's 2015 Annual Report included the following graphic:




88. The Managed Services business continued to be prominently highlighted in Ericsson's 2016 Annual Report, which included a description of the business similar to those included in its prior reports. However, the 2016 Annual Report added some additional details, noting that "[m]anaged services contracts are normally 5-7 years long. The first two phases last for 1-1.5 years while the optimization phase represents the remainder of the contract period." Once again, Ericsson informed the market that it believed that it had "reached a good balance of contracts in the transition, transformation and optimization phases." In 2016, Ericsson reported an "operating margin" of 3% from its Global Services segment, which at that time housed Managed Services. Ericsson also reported in its fourth quarter results, published January 26, 2017, that it had signed 76 new Managed Services contracts during the year.

89. While Ericsson never disclosed a detailed portfolio of its Managed Services contracts, it disclosed the number of new contracts signed during each year, as follows:

| **Year** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
|---|---|---|---|---|---|---|
| **Number of New Managed Services Contracts** | 70 | 52 | 84 | 71 | 101 | 76 |
| **Source** | 4Q2012 Report | 4Q2012 Report | 4Q2013 Report | 4Q2014 Report | 4Q2015 Report | 4Q2016 Report |

90. These numbers show a total of 454 contracts signed between 2011 and 2016. Furthermore, the number of new contracts varied considerably, ranging from 52 new contracts in 2012 to 101 new contracts in 2015. In 2015, Ericsson was sending a strong message that it was having great success pulling in new Managed Services deals.

91. On March 28, 2017, Ericsson further emphasized the importance of the Managed Services business by breaking it out as one of four standalone Segments in the Company's financial reports. According to the Company's 2017 Annual Report (published after the Class Period), the new standalone Segment accounted for 12% of net sales in 2017. Due to this new reporting segment, Ericsson more explicitly showed the historical and current operating margin for the Managed Services business. The margin had dropped from -1.8% in 2016 to -17.4% in 2017, meaning that by the end of 2017 (and consistent with the allegations herein), it had turned into a major source of reported losses within Ericsson.

**B. Ericsson Represents that It Complies with Accounting Standards**

92. Due to the fact that many of Ericsson's core businesses involve long-term contracts, it was extremely important for Ericsson to accurately inform the market about its performance under those contracts. It is therefore unsurprising that Ericsson assured the market that it was in compliance with the relevant accounting standards governing these long-term contracts.

93. In each of its annual reports for fiscal years 2013-2016, Ericsson reported that its financial statements were prepared in compliance with IFRS. Furthermore, each of these reports stated that "[t]he Board of Directors and the President declare that the consolidated financial statements have been prepared in accordance with IFRS" and that the reporting gives "a fair view" of Ericsson's "financial position and results of operations." Each of these reports

also included a statement that the Company's "financial statements were approved by the Board of Directors."

94. Ericsson also reported that it had sufficient internal controls in place to assure that it was following these accounting principles. For example, each of its annual reports for fiscal years 2014-2016 reported that its management "is responsible for establishing and maintaining adequate internal control over financial reporting for the Company." Each of these annual reports also explained that "Ericsson's management assessed the effectiveness of Ericsson's internal control over financial reporting," and that based on this assessment, "management has concluded that . . . Ericsson's internal control over financial reporting was effective at a reasonable assurance level."

95. Relatedly, each of Ericsson's annual reports contained SOX certifications, signed by Defendants Vestberg and Frykhammar for Ericsson's annual reports for years 2013-2015 and by Defendants Ekholm and Mellander for Ericsson's 2016 Annual Report, which stated the following:

> 1. I have reviewed this annual report on Form 20-F of Telefonaktiebolaget LM Ericsson (publ) (the "Company");
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;
>
> 4. The Company's other certifying officer and I . . . have:
>
>> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the

> Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]

96. Through these certifications and statements, Defendants represented to the market that Ericsson complied with the relevant accounting standards. A failure to follow these rules would render Defendants' statements that Ericsson follows the relevant standards, and that its reports and financial statements provide a fair view of the Company, false. The two most relevant rules that Defendants violated were those concerning the recognition of expenses and recognition of revenue.

**1. Recognition of Expenses**

97. The general rule regarding the recognition of expenses under IFRS, as issued by the International Accounting Standards Board ("IASB"), is explained in its "Conceptual Framework for Financial Reporting." Section 4.49 (*i.e.*, F 4.49) states that:

> Expenses are recognised when a decrease in future economic benefits related to a decrease in an asset or an increase of a liability has arisen that can be measured reliably. This means, in effect, that recognition of expenses occurs simultaneously with the recognition of an increase in liabilities or a decrease in assets.

98. Under this rule, expenses are supposed to be recognized as costs are incurred. There are exceptions to this rule, such as for expenses related to certain long-term amortizable assets, but this rule explains the treatment of most expenses—including most of the expenses relevant to performing work under Ericsson's long-term contracts, such as cash payments to purchase construction supplies or to pay the salaries of employees or contractors. In any event,

pushing costs forward to inflate financial performance during a given reporting period is not allowed.

99. When dealing with many long-term contracts, IFRS requires, through International Accounting Standards ("IAS") rule 11, that Ericsson apply an additional rule to the recognition of expenses. This rule holds that an expected loss should be recognized "as an expense ***as soon*** as such loss is probable." IAS 11.22 (emphasis added). Ericsson stated that it followed this rule on all of its contracts. It stated in its Annual Reports throughout the Class Period that "[t]he profitability of contracts is periodically assessed, and provisions for any estimated losses are made ***immediately*** when losses are probable." (Emphasis added).

100. Under this rule, if Ericsson had a contract that, under the contract price, was going to produce revenues of $100 million at a cost of $150 million, Ericsson would have needed to take an immediate loss of $50 million. As a result, Ericsson could not adopt a wait-and-see approach or otherwise hope that the loss could be avoided through improved future performance. Thus, if Ericsson entered into a loss-leading contract or if it became probable that one of its contracts would ultimately produce a loss (for example, by improperly scoping), the Company had an immediate obligation to recognize the loss.

**2. Recognition of Revenue**

101. The general rule regarding the recognition of revenue under IFRS, as issued by IASB, is explained at IAS 18, which states that "[r]evenue should be measured at the fair value of the consideration received or receivable" where there has been an "exchange of . . . items."

102. However, there is a more specific rule that governs service contracts. Revenue from service contracts should be recognized "by reference to the stage of completion of the transaction," known as the "percentage-of-completion method." IAS 18.20. Under this rule, revenue for service contracts should only be recognized where: (1) "the amount of revenue can

be measured reliably"; (2) "it is probable that the economic benefits will flow to the seller"; (3) "the stage of completion at the balance sheet date can be measured reliably"; and (4) "the costs incurred, or to be incurred, in respect of the transaction can be measured reliably." A key concept in recognizing revenue through this rule is determining the "stage" or "percentage" of project completion.

103. When dealing with long-term contracts related to delivering assets to a customer—which would include many of Ericsson's long-term service contracts that involve the delivery of networking or telecommunications equipment—IAS 11 states that the "stage of completion of a contract can be determined in a variety of ways—including the proportion that contract costs incurred for work performed to date bear to the estimated total contract costs, surveys of work performed, or completion of a physical proportion of the contract work." IAS 11.30.

104. In its annual reports during the Class Period, Ericsson described its revenue recognition practices for service contracts as follows:

> These relate to multi-year service contracts such as support- and managed service contracts and other types of recurring services. Revenue is recognized when the services have been provided, generally pro rata over the contract period. Global Services has contracts that relate to this type of arrangement.

105. The reference to recognizing revenue "when the services have been provided, generally pro rata over the contract period" is a reference to measuring revenue according to the stage of completion. Former employees of Ericsson (FE 1 and FE 2, introduced below) stated that Ericsson used the percentage-of-completion method to calculate revenue. Thus, for a fixed-price contract, Ericsson could claim a percentage of that fixed-price as revenue, based on the percentage of the project it had completed.

106. Furthermore, under this system, Ericsson was generally supposed to calculate the completion percentage by dividing costs-to-date by the costs it had scheduled as expected for the project, as the following equation illustrates:

$$revenue\ recognized = (contract\ price) \times \frac{costs - to - date}{scheduled\ costs}$$

107. For example, if a $200 million contract had costs-to-date of $10 million and scheduled costs of $100 million, Ericsson could claim the project was 10% complete and therefore recognize $20 million in revenue—*i.e.*, 10% of $200 million. In this example, the formula is as follows:

$$\$20\ million = (\$200\ million) \times \frac{\$10\ million}{\$100\ million}$$

108. While this is a simplified model and does not account for the possibility of additional constraints on recognizing revenue, it demonstrates the relationship between expected project costs and the amount of revenue that can be recognized at any given time. If the above example is manipulated by scheduling costs at $50 million when Ericsson knew they would be at least $100 million, the formula would reflect the following (changes in bold):

$$\mathbf{\$40\ million} = (\$200\ million) \times \frac{\$10\ million}{\mathbf{\$50\ million}}$$

109. In that example, Ericsson would have prematurely recognized $20 million in revenue ($40 million it recognized versus the $20 million it should have recognized). Therefore, to truthfully represent compliance with the IFRS, the Company must engage in reasonable efforts to accurately account for the expected costs of a project. Indeed, because the scope of work required on a contract has a direct relationship to expected costs, a failure to properly define the scope of work would severely compromise the Company's ability to properly report revenue associated with the project. Furthermore, if the failure to define the

scope of work enables the customer to increase the expenses associated with a project, the Company will understate its expected costs and correspondingly prematurely recognize revenue.

### C. Ericsson Fails to Adequately Account for Its Contracts

110. Despite repeatedly assuring the market that it complied with accounting standards regarding its long-term contracts, Ericsson regularly failed to adequately account for the true financial position of its contracts. As detailed below and elsewhere herein, these problems were part of a coordinated scheme by the Company to increase its market share, were widely known throughout Ericsson, and were in fact known by Ericsson's executives, including the Individual Defendants.

#### 1. Ericsson's Practice of Improperly Accounting for Costs

111. Former Employee 1 ("FE 1") was employed by Ericsson for all of 2014, 2015 and 2016. He held a senior position in Ericsson's North American operations, reported directly to the Head of Operations in North America, and oversaw over 2,000 employees.[7] Through his role, he was responsible for executing on and managing many of Ericsson's multi-year service projects.

112. According to FE 1, by the second quarter of 2016, Ericsson had adopted much more aggressive pricing strategies to account for shrinking revenues associated with shrinking investment in fourth-generation (*i.e.*, 4G) cellular networks. FE 1 said that one of the big aggressive pricing campaigns was called "Feed the Gorilla"—a policy that FE 1 confirmed was approved by the Head of North America at the time. In the words of FE 1, under the "Feed the Gorilla" campaign, the consensus was "everything goes" and "all is forgiven" when it came to

---

[7] At all relevant times, the Head of North America served on the Company's Executive Leadership Team. According to Ericsson's website: "The President and CEO is responsible for the management of day-to-day operations and is supported by the Executive Leadership Team."

entering into contracts, as the notion was “why don’t we just sell and make it believable later.” He explained that almost every project (including Managed Services and NRO Projects) where there was competition from Nokia was part of the campaign, including contracts with Verizon (one of Ericsson’s largest customers). For example, FE 1 described two projects for cable companies—one for Cox Communications in San Diego, and another for CenturyLink in Las Vegas—that were part of the “Feed the Gorilla” campaign. There were cost overruns in both of those projects and, when the issue was raised, the sales team would dismiss the issue and say “don’t worry about [it].”

113. FE 1 personally oversaw roughly five “frame” contracts at any given time—a term Ericsson used to describe multi-year, large-dollar projects—and, according to FE 1, two of these five projects typically had cost overruns. FE 1 explained that Ericsson was giving itself favorable financial treatment on its contracts as early as 2013, and that he had observed cost overruns by as early as 2013. More specifically, FE 1 described three primary ways that Ericsson failed to recognize costs.

114. First, Ericsson would push costs into the future rather than recognizing them as they arose. FE 1 explained that Company employees would push expenses into the next quarter and, while he did not personally do this, he observed Account Vice Presidents advocating to defer costs during meetings. According to FE 1, the Verizon contracts were “notorious” for having their costs rolled into later quarters “simply to make numbers,” and this was a “normal practice” at Ericsson. Similarly, he explained that it was common to push costs related to AT&T into the next quarter. According to FE 1, this practice was known to the top management in the U.S., including both the U.S. CEO and CFO.

115. Second, Ericsson would enter into aggressively priced contracts with an "open-ended commitment," which required Ericsson to continue performing under the contract regardless of the actual costs. For example, FE 1 described a contract that Ericsson entered into in 2012 for the installation of telecommunications infrastructure at Grand Central Terminal, in New York, that followed this model. At its inception, the project had fixed revenue of roughly $8 million and scheduled costs of roughly $5-6 million. However, because the project had "open-ended" terms, there was nothing Ericsson could do as costs continued to pile up. According to FE 1, when the project began, Ericsson was tasked with fixing "leaking fibers" and then the customer added an antenna repair component, then a component to install different antennas, and finally an entire "new line." By May 2017, the project had grown to roughly $57 million in costs, and FE 1 believed that the project cost had grown to roughly $157 million by March 2018. However, FE 1 explained that the Company should have known the true cost from the start of the project.

116. The use of improper scoping was not an isolated occurrence within Ericsson. FE 1 described a fiber project for Cox, which started in 2015, as another example of an "open-commitment" project with a "fixed price" and changing cost structure—and noted that this project also ran into cost overruns. He also mentioned a project for CenturyLink as having "scope creep."

117. The practice of taking on contracts at low fixed prices, and then slowly allowing the scope of the project to expand, fit into Ericsson's continuing, aggressive strategy to expand market share at all costs—and, as FE 1 explained, the practice became more prevalent in 2012-2013. According to FE 1, entering into contracts at low fixed prices allowed the Company to win projects and was part of its strategy. Winning these contracts allowed Ericson to publicize

its continued success in securing new work—and the use of inaccurate scoping enabled the Company to exaggerate its expected profit and margins over the short-term. This practice, however, required the Company to incur substantial incremental costs as the customer tacked on additional activities outside of the original project scope. In the words of FE 1, the Company chose not to "clos[e] the scope," which allowed customers to change and add whatever they wanted mid-project.

118. Third, the Company would take new projects on low or negative margins because the sales team was heavily incentivized by upfront commissions. For example, FE 1 noted a project for Sprint that was taken on at either extremely low or negative margins. He further noted that such projects had negative operating income. Similarly, FE 1 explained that some network rollout contracts were sold at low or negative margins by Ericsson's sales teams.

119. As is clear from this former employee, these were not isolated problems, but rather were part of a trend toward aggressive pricing and accounting within Ericsson. FE 1 also explained that senior management within Ericsson was aware of these practices. When asked whether Defendant Vestberg knew about the aggressive pricing and the "Feed the Gorilla" campaign, FE 1 said "of course" and then noted that "there were t-shirts" with the slogan printed on them.

120. Former Employee 2 ("FE 2") was employed by Ericsson from September 2006 until December 2017. From May 2016 until the end of his tenure, he was responsible for overseeing one of Ericsson's large contracts with a major customer in the United States. Prior to that, he held the position of Director of Operations beginning in January 2016, and prior to that he served as a Finance Director. He reported directly to a Vice President who oversaw business operations and finance; this Vice President, in turn, reported to the North American

Chief Operating Officer. During his time as a finance director, he worked on internal audits in accordance with SOX.

121. FE 2 described "inappropriate actions" by Project Managers, wherein they would agree to change the scope of a contract, but then due to inappropriate handling of change orders, there would be a dispute about billing for the project. He explained that one such dispute was brought to the attention of everyone in service delivery at a meeting where the situation was reviewed. FE 2 further explained that this sort of problem occurred with lots of Project Managers because of pressure from management to make favorable margins.

122. This problem is a variation on the "scoping" issues described previously. Whereas FE 1 described scoping from the start of contracts (in the initial contract terms), FE 2 described a situation where changes to the scope were agreed upon, but the corresponding change orders were handled improperly. Thus, FE 2 explained, when contracts were entered into they would be scoped at a low amount, but those working on the project would later agree to increase the scope without securing a contractual change order. Regardless of whether the problem was introduced at the initial signing or thereafter, improperly managing the scope of contracts ensured that Ericsson did not adequately account for the costs associated with its contracts.

123. FE 2 also described a problematic practice regarding the treatment of costs with Ericsson's contracts with AT&T. He explained that Ericsson would bill AT&T for projects in advance but wait until the project was completed before recognizing the costs. However, IFRS requires that expenses be recognized when they arise, not when a project is completed.

124. FE 2 further explained that he was familiar with the "Feed the Gorilla" campaign and noted that the issues generated by this program were primarily seen with the

sales teams. He explained that the sales teams were "bullying" and "very unscrupulous," and that there was a Company-wide culture whereby the sales team was always right and the delivery team just needed to "make it work."

125. Former Employee 3 ("FE 3") was employed by Ericsson from April 2014 until January 2017. At the end of his tenure, he worked out of the Company's North American headquarters as a Technical Sales Manager and before that served as a Customer Project Manager. FE 3's role involved working with sales teams on creating pricing menus for long-term service contracts. His largest contract was a "turf agreement," (*i.e.*, a "frame agreement") with AT&T related to NRO. He also worked on smaller customer accounts. FE 3 reported to the Director of Business Development, who in turn reported to the Vice President of Operations – Program Establishment, who in turn reported to the Head of Service Line Build – North America Region, who in turn reported to the Head of Operations – North America Region.

126. According to FE 3, it was common practice within Ericsson for sales representatives to offer significant discounts over what was supposed to be charged based on the Company's menu pricing. For example, AT&T would order a service from the "menu pricing" but would do so based on an underestimated amount of work. According to FE 3, Ericsson had a problem, even on the turf agreements, with "poor scoping." FE 3 added that Ericsson would pay a very high cost based on these scoping issues. Moreover, as FE 3 confirmed, Ericsson regularly failed to accurately account for the true work required to complete its contracts, explaining that these problems occurred on "all projects." He added that the scoping on Ericsson's projects was "terrible" and that "those in sales were incentivized to under scope."

127. FE 3 also explained a specific type of poor scoping he observed on projects. It was apparently not uncommon for Ericsson to send out highly expensive "tiger teams" to resolve post-installation problems. However, the costs related to these projects would not be included in the "overly optimistic" scoping—and Ericsson would not build-in sufficient "contingencies" to account for these costs.

128. Referring specifically to AT&T, FE 3 said that Ericsson frequently had to send teams of vendors back to a job to complete work because the scope was more expansive than originally represented. However, FE 3 explained that Ericsson's sales representatives did not want to charge for the additional work and, in fact, would not charge the customer for cost overruns. He recalled that he was "frequently instructed" not to invoice for additional service work that needed to be done on jobs and described that many projects were losing money. He cited a project with Alltel, which was ongoing in 2014-2015, upon which Ericsson took an "8-figure" loss, due to agreeing to provide certain fiber optic work and ultimately needing to provide much more expensive radio boxes.

129. FE 3 was familiar with the "Feed the Gorilla" campaign and explained that it started around 2016. Additionally, FE 3 confirmed that shirts were distributed with the slogan "Do ~~Not~~ Feed the Gorilla" printed on them. He explained that this was meant to promote more risk seeking behavior and called for employees to be more aggressive in bringing in new contracts.

130. Former Employee 4 ("FE 4") was employed by Ericsson from November 1983 until March 2017. At the end of his tenure, he worked as a Senior Project Manager responsible for, among other things, estimating resource use and costs for projects. FE 4 worked in a role

focused on information, communications and telecommunications, which Ericsson refers to as ICT. He reported to the Global Head of Systems Integration.

131. According to FE 4, the Company would sometimes proceed with projects that had low or negative margins, characterizing the Grand Central Terminal project for Verizon as an example of a project with negative margins. More generally, FE 4 was familiar with the Company's customer accounting system and said that the system was not "good." Additionally, he related that Ericsson improperly scoped service projects, stating that he and other Project Managers knew there tended to be huge cost overruns on projects.

132. FE 4 was also familiar with the "Feed the Gorilla" campaign and believed that it originated from Ericsson's headquarters in Sweden.

133. Former Employee 5 ("FE 5") was employed by Ericsson prior to and throughout the entirety of the Class Period. At the end of his tenure, he worked as an Operations Manager and focused on Optimization for Ericsson's customers. FE 5 worked out of Ericsson's offices in Plano, Texas.

134. FE 5 explained that there were Managed Services contracts in India and other locations that "were never properly scoped" when those projects were initially contracted. He added that scoping issues came up because Ericsson would leave the metric defining contract completion undefined and then would be left on the hook to give the customer whatever they wanted. He likened the practice to agreeing to deliver a "sports car" without agreeing on a definition for the term.

135. He also explained that he was aware of, and knew of other employees who were aware of, loss-leading contracts. Further, FE 5 explained that Ericsson was told by Company personnel that the billing platform for a T-Mobile project was "going horribly," but that

management continued to say it was doing well. When asked about the Grand Central project and when the Company would have known about cost overruns, he said that the Company would have known in about six to twelve months after the project started.[8] FE 5 was also familiar with the "Feed the Gorilla" campaign, which he described as an attempt to "keep up the sales momentum."

136. Former Employee 6 ("FE 6") was employed by Ericsson from August 2013 until November 2017. At the end of his tenure, he worked as a Chief Operating Officer ("COO") for Managed Services. He worked on contracts in both Europe and Africa for Ericsson.

137. FE 6 was familiar with at least 24 long-term service contracts that Ericsson entered into with the understanding that they were going to lose money. This included contracts in Europe and Africa, for which he had operational oversight, that were losing money for over five years as of November 2017. As examples of such contracts, FE 6 described Ericsson's contracts with Orange in Mali and in Belgium and contracts in Cameroun, and noted there were many of this sort in India and Africa. He further explained that Ericsson did not care about the costs of these contracts because it entered into them solely to gain market share. FE 6 added that this practice was going on during his entire tenure with the Company.

138. According to FE 6, the decision to enter into these contracts was managed by Ericsson's regional heads and that it was difficult for them to let go of customers despite entering into contracts they knew from the beginning would be losers. He recommended that Ericsson pull out of some of these contracts in 2016, but received pressure from "higher management" to stick with the projects despite their negative returns. When asked if senior

8 The Grand Central project started in 2012.

management knew that these contracts were loss leaders, FE 6 responded: "Yes [they] must have been aware" because Ericsson would compare the performance of all of its regions and rank them each quarter. In fact, every quarter they would rank all regions and all Managed Services contracts on revenue, cost, efficiencies, etc. According to FE 6, the worst-performing regions were consistently southern and central Africa.

139. Moreover, FE 6 recounted that the problems related to poorly constructed contracts were global issues for Ericsson with Managed Service contracts. He indicated that Jean-Claude Geha ("Geha"), head of the Managed Services business, and people senior to him, would have been aware of these problems. He also explained that Defendant Vestberg was involved in negotiating many of Ericsson's large Managed Services contracts—and specifically recalled that Defendant Vestberg negotiated directly with the CEO of France Telecom.

140. FE 6 also recounted problems with the way Ericsson built in cost-saving assumptions into its contracts—another variant on the scoping problems detailed herein. He said that Ericsson needed to save costs for customers to make proposed Managed Services deals work. In other words, when offering to manage a customer's network, Ericsson had to offer the customer a rate that was lower than the customer's current operating expenses—and yet to make the transaction financially viable for Ericsson, the Company would need to reduce the cost of operating that network. However, according to FE 6, in many cases, Ericsson would only be able to show cost savings if it built in unreasonable cost-saving assumptions, which it knew would not materialize. Thus, according to FE 6, the Company knowingly took on contracts that were losing from day one. He added that there was "a lot of stuff we knew

[wasn't] going to materialize and savings that were totally unreasonable." FE 6 also confirmed that Ericsson was not building in contingencies for these costs.

141. Furthermore, FE 6 explained that Geha and people above him—including Vestberg—were aware of the Company's decision to knowingly take on contracts with unreasonable assumptions regarding costs. According to FE 6, even though Ericsson knew that many of these contracts were likely to lose money, it took them on anyway.

142. Former Employee 7 ("FE 7") was employed by Ericsson throughout the Class Period and served as a Director of Deployment for Managed Services. He was based in the United States and worked on Managed Services contracts in many Caribbean countries. FE 7 was two reporting levels below Geha, who, as noted, reported to Defendant Mandersson.

143. FE 7 advised that decisions in long-term service contracts were not made lightly and involved various approvals along different levels that included approval from global headquarters in Sweden. He also explained that the Heads of Managed Services and other senior executives above them (including Geha) were updated on decision points regarding these contracts. He added that senior executives were on a distribution list for email updates on decision points and that a process called "Road Maps" or "Sales Funnels" updated the whole organization of decision points on these contracts.

144. According to FE 7, Ericsson's operations were tracked in a web-based environment accessible to those in the field as well as senior management in Sweden and cost overruns were tracked in an excel chart. He recalled that there were always calls taking place to discuss cost overruns and that there were even employees referred to as "boomerangs" whose job it was to travel (globally) and ascertain why a long-term service contract was not performing well.

145. FE 7 said that quarterly "report cards" on the profit and loss performance of service contracts as well as trends were sent to corporate headquarters. He further noted that there was a separate report that tracked efficiencies and costs that was circulated quarterly and included "champion" performers for each quarter, and regional reports that included rankings per region. FE 7 said that people would discuss these reports and that he received calls from those senior to him about the performance of his projects based on these reports.

146. FE 7 was familiar with a project Ericsson had in Nigeria that had significant cost overruns. He recalled that the project was entered into in an effort to gain market share with the understanding that Ericsson would not make money on the project.

147. Additionally, FE 7 explained that during the 2013/2014 time-frame, Managed Services customers got aggressive in asking for discounts and wanting to renegotiate the terms of the contracts or add additional services. FE 7 added that key account managers often gave the customers whatever they wanted. FE 7 also explained that Ericsson would take on contracts that were not expected to be profitable during the initial periods of the project with the hope that these projects would become profitable at later stages. Similarly, according to FE 7, Ericsson took on projects that it knew would not be profitable ever, with the hope that doing so would result in the sale of equipment or other business outside the scope of the original agreement, but he noted that these additional sales often did not materialize.

### 2. Ericsson's Practice of Prematurely Recognizing Revenue

148. Ericsson's fraudulent scheme to misrepresent its financial condition also involved the premature recognition of revenue.

149. The widespread and customary business practices detailed above at Ericsson, which under-represented the costs associated with long-term projects, allowed the Company to prematurely recognize revenue. Given that Ericsson booked revenue based on the percent that

a project was completed—which in turn is based on the total cost to complete the project—the practice of taking on "open scope" contracts ensured that Ericsson was not correctly accounting for project revenue. If the total amount of work to be completed on a contract was constantly expanding, during earlier stages of the project Ericsson would predictably claim that a greater percentage of the project was completed than ultimately was (given the ever-expanding scope of the project). Thus, Ericsson's practice of leaving the scope of its contracts open ensured that it would prematurely recognize revenue.

150. Ericsson also engaged in other improper revenue recognition practices. Former Employee 8 ("FE 8") was employed by Ericsson from August 2005 through March 2014 as a Project Finance Manager. Specifically, FE 8 worked in the T-Mobile Customer Unit and worked closely with Project Managers and the Project Management Office. He was responsible for project support tasks including data analysis and revenue analysis. According to FE 8, Ericsson would recognize revenue before sending official invoices to the customer. This was apparently enabled by the design of Ericsson's accounting system, as invoicing required many documents but revenue could be recognized with "just a few keystrokes."

151. Additionally, FE 1 acknowledged that the Company sometimes had to take revenue reversal entries[9] because it had recognized revenue too quickly, and the customer would end up cancelling the contract after the revenue had been booked. Furthermore, there were times when FE 1 was aware that the Company recognized a percentage of a project's revenue even though doing so was premature. For example, AT&T would impose certain milestones in its contracts, but Ericsson would get AT&T to sign off on a milestone—prior to

[9] Reversal entries can occur from innocent behavior, such as when a customer returns a product. The practice of premature revenue recognition makes reversal entries more likely, however, because it pulls revenue forward in time, which expands the period in which a cancellation may result in a reversal.

actually reaching the milestone—in order to internally record the revenue. FE 1 explained that sometimes this practice went as far as putting a piece of equipment or hardware needed for the milestone "on the loading dock," so that internally Ericsson could indicate that the milestone was cleared in order to record the revenue – a practice corroborated by FE 4.

## D. Ericsson's Fraudulent Scheme Is Revealed

### 1. July 17, 2016 – SvD Article Partially Reveals that Ericsson Was Prematurely Recognizing Revenue

152. The problems with Ericsson's premature recognition of revenue were partially revealed in an article published by SvD—a daily newspaper published in Stockholm, Sweden—on July 17, 2016. The article stated that concerns were growing internally at Ericsson due to the Company's use of aggressive accounting techniques. According to the article, Ericsson was recognizing revenue that it expected to receive in the future—and according to the article's unnamed sources (Company insiders), the Company had dug so far into the future there was a great risk of empty quarters ahead. The article, which discussed Ericsson's service contracts, warned that revenue from existing contracts had been so fully recognized that these contracts are now virtually empty—*i.e.*, that most of the long-term contracts had already been accounted for as sales.

153. The result of this practice, like all premature revenue recognition schemes, was to artificially inflate Ericsson's margins at earlier points in time, such that margins would collapse at a later point in time as the Company incurred costs to perform its obligations under the contracts without bringing in new revenue.

154. As noted, the SvD article was published in Swedish on July 17, 2016, a Sunday. By Monday, July 18, 2016, the trading price of Ericsson's ADS decreased from $7.77 to $7.54 per share (an almost 3% drop), on unusually high volume of more than 8 million shares traded;

and by Tuesday, July 19, 2016, it had decreased to $7.08 per share (an additional 6.1% drop), on extraordinarily high volume of nearly 12 million shares traded.

155. Ericsson responded to this article on July 18, 2016, predictably denying the allegations and asserting that it complies with all relevant accounting standards—a denial that Defendant Frykhammar reiterated during a conference call on July 19, 2016. This denial continued to mislead the market as to the extent of the massive problems at Ericsson.

### 2. 1Q2017 – Partial Disclosure of Unprofitable Contracts

156. Ericsson posted a press release on the morning of March 28, 2017, announcing a new business strategy and describing certain organizational changes within the Company. The press release also stated that "separately" from this reorganization, "provisions of an estimated SEK 7-9 b. will be required in Q1, triggered by recent negative developments related to certain large customer projects." In U.S. dollars, this provision ranged from $900 million to $1.16 billion. This provision was significant in the context of Ericsson's operations; even at the lower estimate of $900 million, it was more than three times greater than the Company's entire 2016 profit—and more than half of Ericsson's annual profit, even during its most profitable year during the Class Period. Ericsson's ADS was negatively affected by this news and by the close of business on March 28, 2017, the trading price of the ADS had decreased by $0.24 (or 3.59%) to close at $6.45 per share.

157. Later that day, Ericsson hosted a conference call in which Defendant Ekholm and Defendant Mellander discussed the press release. In the opening remarks, Defendant Ekholm explained that "in addition" to the reorganization activity, Ericsson had some "large customer projects where we have decided, due to negative events during 1Q, to take a provision." He further indicated that this was "unrelated to the strategic review" to reorganize the Company. In the afternoon session of that conference call, Defendant Ekholm further

clarified that "we have reviewed our contract portfolio and project portfolio" and "due to some specific events related to certain large customer projects, we have a need to take a provision of SEK 7 billion to SEK 9 billion in 1Q." He also said that Ericsson has a "large number of projects" but that these provisions relate to "specific and certain of the large ones."

158. During the morning conference call, an analyst from Barclays PLC asked about the breadth of these contracts—*i.e.*, whether it was just one or two isolated incidents. Defendant Ekholm responded that it related to a "few" contracts "where we see that we need to allocate more resources in order to deliver on the projects" and further stated that these were "isolated incidents." The same analyst asked whether the issues reflected a "structural problem." After indicating that they were not structural problems, Defendant Ekholm explained the timing of the release: "[w]e just felt that we needed to communicate those provisions now rather than wait and do it in a separate release, so we just bake them together for simplicity."

159. In the afternoon session of that conference call, an unidentified analyst asked what was behind the provisions. Defendant Ekholm replied that like they do "every quarter," he and other members of Ericsson's management had gone through the portfolio of projects, and explained that they had seen "negative developments, which could be lower expected revenues or higher costs to complete those projects . . . due to specific events during the first quarter."

160. Despite Ericsson's explanation that these provisions resulted from "negative developments," the market began to understand that these provisions were necessitated by Ericsson taking on unprofitable contracts and then letting those unprofitable contracts pile up

on its books. Altogether, analysts responded negatively to the news, but took comfort in Ericsson's assurance that these problematic contracts were an isolated incident:

(a) An analyst report by JPMorgan published on March 28, 2017 stated that Ericsson highlighted that provisions of SEK 7-9 billion will be required due to "extra costs incurred" for "certain large customer projects," but noted that Ericsson had "clarified that this provision should be viewed as an isolated incident and that Ericsson is committed to fully delivering on these projects."

(b) An investment bank called Natixis released an analyst report on March 29, 2017 noting "we don't recollect Ericsson taking this sort of provision before. Cost over-runs on services and even trial networks have historically just impacted operating income directly," and went on to explain "[w]e suspect that the provisions relate to IT managed services contracts focused on digital transformation. Ericsson signed several contracts of this nature in 2014 and 2015 and materially under estimated costs, resulting in significant cost pressures through 2016."

(c) On March 28, 2017, Credit Suisse issued an analyst report discussing the Company's "[l]oss making contracts in Managed Services," among other topics. This report stated that "near term trends" for Ericsson remained "weak" and listed the provisions as one of three factors.

(d) On March 28, 2017, European Equity Research issued an analyst report and noted that the SEK 7-9 billion provisions were "linked to underperforming projects." It further stated "[w]e see Ericsson clearly trying to fully clean its accounts with these announced incremental charges"—a clear reference to the fact that prior to this "clean[ing]," Ericsson's books were, in fact, "dirty" with previously undisclosed loss-making contracts.

(e) A March 29, 2017 newsletter by JPMorgan called "Rod Hall's Daily Download" said that "the provision required for 1Q17 due to extra costs incurred on certain large projects (although flagged as an isolated incident by the management) is likely to be a drag on the near-term sentiment, in our view."

(f) Kepler Cheuvreux published an article on March 29, 2017 describing the provision as "due to recent negative developments on certain large customer projects where the group suffers from over-runs)."

(g) On March 29, 2017, SEB issued an analyst report stating: "The big negative news was the provision related to the clean-up of strategically important loss-making contracts of SEK 7-9bn [billion] (4% of market cap), which will hit Q1."

(h) On March 29, 2017, an analyst report from Liberum discussed the provisions and stated that it was "not clear what these projects are," but that it is believed "they contain a larger proportion of services revenue than product revenue." The report further stated that the need for the provisions "raises questions about Ericsson's internal controls and bidding processes."

161. Additional details about these provisions came to light when Ericsson reported its first quarter results on April 25, 2017. At that time, Ericsson explained that it made provisions of SEK 8.4 billion ($1.08 billion) related to customer contracts and that SEK 5.5 billion ($707 million) of these provisions was for "additional project costs, mainly related to certain transformation projects in IT & Cloud, which due to recent negative developments are not expected to be covered by future project revenues." In response, analysts questioned the integrity of the Company's projects—and the root cause of the provisions—during the conference calls for Ericsson's 1Q results.

162. For example, during the morning conference call on April 25, 2017, an analyst from Credit Suisse commented that "some of these NRO and Managed Services contracts that Ericsson has taken haven't proved to be profitable in the long term," and asked: "[W]hat is the change in company strategy as you approach trying . . . to renew contracts?" Defendant Ekholm replied: "Clearly, what we are seeing is that we have contracts today that are not profitable. We see that in NRO. We see that as well in Managed Services. And these are contracts that we will now approach and manage in order to get them either to profitability or we will probably not extend them."

163. Similarly, an analyst from Barclays posed a question about Ericsson's profitability, by noting that Ericsson had "[c]learly . . . priced [its contracts] to win" but observing that they are now "proving problematic in terms of profitability." Accepting this premise, Defendant Ekholm's response stated that Ericsson will "build on the learnings" it has had and that he is "very comfortable" with the Company's competitiveness.

164. In the afternoon session of the 1Q2017 earnings conference call, an unidentified analyst asked: "is it . . . your analysis that the sales incentives were inappropriate, and they rewarded winning short-term contracts, but not long-term profits? Or is it, in your analysis, more of an engineering issue about being able to deliver what the salesman promised?" Defendant Ekholm's reply focused on scoping—and confirmed that poor scoping had resulted in unprofitable contracts—as follows:

> No, it's -- the -- I think it's fair to say that we do have a number of very large IT transformation, digital transmission projects at our customers. And here, we're -- this is a new market. So it's an element of, call it, not knowing exactly how -- what demands you would put on a new system, so we label it as where we have to improve the scoping. So it's more our old ability to scope these projects well enough when they're in areas that have not -- we nor anybody else have done before. And that's really why we're -- this

> is, call it, a step-by-step learning experience where we have taken -- of course, here, you can accuse us of having taken some projects with now we have to provide again. But they're really done because we are entering a new area where it takes some time to build the experience base internally to scope them well enough. And it's not sales incentive or anything like that, it's rather our -- when you enter unchartered territories, by definition, you don't know all the facts.

165. Accordingly, although Defendant Ekholm attempted to mitigate the implications of the Company's poor scoping practices, he acknowledged that the unprofitability of the contracts was not the result of some extrinsic cause (*e.g.*, a spike in some commodity price) and confirmed that Ericsson was carrying a large number of unprofitable contracts. Thus, when the analyst asked a follow up question—"do you imagine this is an industry-wide problem, just [an] inability to scope correctly?"—Defendant Ekholm replied that he could not judge if others were having this problem, but noted that they were learning from "past experiences in order to make sure that we're better at it going forward."

166. Another telling exchange occurred in the afternoon call, when an analyst at Charter Equity Research asked: "is the change in terms of the contract by the customer or the scope of the contract or was it just realizing you aren't going to be able to deliver on . . . the original terms for the cost that you originally thought you could?" Defendant Mellander responded, recognizing the scoping problems: "I think when it comes to scoping, we have learned a lot . . . and some of those projects . . . could have been scoped in a better way." Defendant Ekholm repeated the same, noting that "when we have done the scoping to some extent, we could have done it better." This prompted the analyst to ask: "[s]o it sounds like less than a change in the market or eroding market profile and more just [a] learning curve on how to do these projects and how to scope them better?" And Defendant Ekholm responded: "That's correct."

167. These statements made clear that no "negative developments" caused Ericsson to recognize these massive losses in the first quarter of 2017. Rather, and as supported by former employees, Ericsson had been carrying loss-making contracts on its books; Ericsson just decided that 1Q2017 was the time to recognize those losses. Moreover, as otherwise detailed herein, it was well understood within the Company that Ericsson had entered into many loss-making contracts, had routinely allowed (and expected) the costs associated with contracts to spiral out of control, and had failed to adequately account for costs as they mounted.

168. Analyst coverage of the 1Q2017 results reconfirm that analysts generally took comfort in Defendants' assurances that the provisions were of limited breadth. For example, the firm Kepler Cheuvreux stated in an April 25, 2017 analyst report that Ericsson delivered "weaker-than-expected results globally in Q1 with very large one-offs, including a Jumbo SEK8.4bn [billion] provision (linked to massive over-runs in services contracts)." Similarly, Liberum wrote on May 2, 2017: "The IT transformation projects for which provisions were taken in Q1 are likely to have been putting pressure on profitability for many quarters. By taking provisions . . . these headwinds to the P&L are likely to have been removed. However, the ability of the company to avoid such low margin projects in future remains to be seen." Most analyst commentary was muted due to the fact the provisions had previously been announced. For example, analysts from Jyske Bank wrote: "provisions and adjustments totaled SEK 8.4bn [billion]. However, these were already communicated in March and are one-off items."

### 3. 2Q2017 – Full Disclosure of Unprofitable Contracts

169. On July 18, 2017, Ericsson posted its second quarter results. The first sentence of the report stated: "[w]e are not satisfied with our underlying performance with continued

declining sales and increasing losses." The report went on to explain that Ericsson was continuing to "refocus [its] Managed Services business to improve profitability" and stated that the Company had identified 42 contracts—with sales in the prior year worth $892 million—that it would either "exit, renegotiate, or transform." Ericsson reported in its 2016 Annual Report that it had more than 300 ongoing contracts; using 300 as an estimate of the Company's number of contracts, renegotiating 42 contracts would be about 15% of Managed Services contracts.

170. Ericsson further stated that it saw an "increased risk of further market and customer project adjustments, which would have a negative impact on results, estimated to SEK 3-5 b. [($386-$643 million U.S. dollars)] for the coming 12 months." In other words, Ericsson was disclosing that it had many unprofitable contracts, but that it was not taking an immediate provision to account for these expected losses. Instead, Ericsson was forecasting the provisions it was expecting to take.

171. Ericsson's ADS was negatively affected by this news and by the close of business on July 18, 2017, the trading price had decreased by $1.21, or 16.62%, to close at $6.07 per share.

172. In the related earnings call on the morning of July 18, 2017, Defendant Ekholm stated that "we see that there are a number of customer projects that we need to renegotiate" and clarified that the "risk estimate" was an attempt to "quantify what we think could be an outcome of those contracts which we think could hurt the operating income with SEK 3 billion to SEK 5 billion over the coming year." Defendant Mellander reiterated this point and clarified that this new disclosure was in addition to the provisions made in 1Q2017, stating: "The provisions and customer project adjustments that we communicated in the Q1 report . . .

will, as mentioned then, ***also*** have a cash impact of SEK 5.8 billion" (emphasis added), and then referred to the new "risk" allotment as "additional" to the prior provisions.

173. Additionally, during the morning and afternoon earnings calls on July 18, 2017, Ericsson's executives had several opportunities to clarify what had happened with respect to these contracts. As shown below, in each case, Ericsson's management attempted to mention contributing factors, but ultimately attributed the problematic contracts to a "scoping" problem—which meant that Ericsson had simply taken on contracts that were unprofitable and had been carrying those unprofitable contracts on its books without disclosing that fact.

(a) An analyst from Carnegie Investment Bank asked for more information about the contracts. Defendant Ekholm responded, explaining that "we see a number of contracts which we need to handle, and it involves negotiating with customers, clearance on milestones, scoping, et cetera." He further explained that because the negotiations were ongoing, the exact cost of these contracts was presented as guidance, but not as an actual provision. Finally, he mentioned that Ericsson "also [had] some other, call it, currency-related issues related to those contracts."

(b) An analyst from Charter Equity Research asked for "color on what happened" such that "so many of your contracts have changed so radically that you must undertake such a large program of renegotiation? Were they just written incorrectly or poorly, or have circumstances changed so radically since you were signed that you're compelled to do all those?" Defendant Ekholm's answer made it clear that nothing had really changed—rather the Company was recognizing that it had "scoped" the contracts poorly. He said: "part of it is, of course, we could have scoped the contract better. Part of it is that we decide to conduct less business in a certain area, and that puts us at a negotiating position with customers."

(c) An analyst from Barclays asked for clarification of the relationship between the newly disclosed risk and the provisions set out in the first quarter of 2017. Specifically, he commented: "what has happened over the last few months to result in such a significant change . . . doesn't seem as though the market has changed that much in the last few months, it's presumably contract specific." Defendant Mellander's response focused on explaining that the Company was "much further into the analysis" since the first quarter. In other words, the main change was simply that the Company decided it needed to disclose the risks. He further clarified vaguely that there were business concerns about executing on its strategies and receiving payments from customers.

(d) At the start of the afternoon session of the earnings call, Defendant Mellander stated: "We had done an estimate here saying that between SEK 3 billion and SEK 5 billion might be the hit in the P&L the coming year." He went on to explain the issues with these contracts as follows: "One is related to payment risks, where we have customers with difficulty paying us. Of course, we are in situations there with customers to resolve those situations, but this is what we see now. There are also some challenging projects. Could be cost situations, scoping et cetera, which we are, of course, working hard to turn around as well. And then following the strategic direction with more focus. This is a transformation of our company and there will be costs related to, for example, exiting parts of our businesses which is [sic] not performing today."[10]

174. Near the end of the afternoon session of the second quarter earnings call on July 18, 2017, Ericsson's executives made two further important clarifications with respect to the 42 contracts at issue and the "risk" the Company was guiding for.

[10] Despite the reference to transforming the business, Ericsson had separately made provisions for its reorganizational costs.

175. First, it was disclosed that the 42 contracts were in fact loss-making and had to be renegotiated precisely because they were loss-making. This was implied throughout the questioning, but most clearly indicated in an exchange with an analyst from Kepler Cheuvreux Research. The analyst asked for clarification on the level of proceeds and losses from the 42 "loss-making Managed Services deals" and, accepting the premise that these 42 contracts were in fact "loss-making," Defendant Mellander stated: "We haven't broken out that level of profitability, specifically for the Managed contract. We said that the 42 are the ones under review, they're underperforming contracts . . . But we haven't given a specific number on that."

176. Second, it was disclosed that the $386-$643 million in "risk" identified by the quarterly report covered these 42 contracts but also covered other contracts, where the Company was not attempting to renegotiate their terms. This was clarified in an exchange with an analyst from Bank of America Merrill Lynch, who asked: "And how much of these 42 contracts, how many of these are covered by the SEK 3 billion to SEK 5 billion?" Defendant Ekholm responded that the provisions were not "tied" to the renegotiation of the Managed Services contracts, and also included "other big projects and big customer engagements." In other words, the problems at Ericsson involved more than just the 42 contracts.

177. FE 6 was familiar with at least 24 of the 42 contracts included in the provisions, indicating that they were all over the world, with some in Africa.

178. Analyst reactions to this news were highly negative. Many analysts expressed frustration and noted that the guidance of the forthcoming provisions—after the supposed one-off provisions in 1Q2017—indicated deep problems within the Company. Several examples are listed below.

(a) On July 19, 2017, Kepler Cheuvreux published an analyst report stating that the "risk regarding potential market and customer project adjustments (SEK3-5bn potential impact over the next 12 months, after the Jumbo SEK8.4bn provision booked in Q1) shows that management has a fairly limited grip on operations."

(b) On July 19, 2017, Liberum issued an analyst report entitled "No Light in this tunnel as yet," which expressed more concern for the ongoing charges, costs and provisions that Ericsson was taking on a large number of projects than with the Company's weak sales. The report further stated that the problems with these projects seemed to be "wide ranging" and identified causes as including: "project specification and scope, project completion, revaluation of customer discounts, reassessment of trade receivables, collection of payments, cost overruns and lower than expected revenues." Most strikingly, the report stated that: "[w]hile such issues can come up in one or two projects for any company, the fact that it involves so many projects over such a long time points to more deep rooted structural problems in our opinion." Finally, the report lamented that "Ericsson is yet to show any convincing evidence that the root causes of these problems have been addressed, rather than just addressing the problematic projects themselves. We believe such negative impacts on projects may recur in future."

(c) On July 18, 2017, an analyst report from Deutsche Bank expressed frustration with the Company, writing that "Ericsson reported another set of disappointing results." It explained that Ericsson missed "[a]lmost every metric" and that it is "expecting additional provisions for problematic contracts." It went on to say that "Ericsson continues to underperform while claiming that the period of share losses for the company is over."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

179. During the Class Period, Defendants made numerous materially false and misleading statements and omissions.[11] The statements relate to a common scheme to deprive the market of accurate information regarding Ericsson's financial condition.

### A. Reporting on the Year 2013

180. The Class Period begins on April 24, 2013. On that date, Ericsson published its 1Q2013 results. The quarterly report included financial results that incorporated Ericsson's revenue and expenses, as well as other financial metrics, as reflected in the following excerpted table:[12]

| SEK b. | Q1 2013 | Q1 2012[2] | YoY Change | Q4 2012 | QoQ Change |
|---|---|---|---|---|---|
| Net sales | 52.0 | 51.0 | 2% | 66.9 | -22% |
| *Of which Networks* | *28.1* | *27.3* | 3% | 35.3 | -20% |
| *Of which Global Services* | *21.5* | *20.6* | 4% | 28.0 | -24% |
| *Of which Support Solutions* | *2.4* | *3.0* | -19% | 3.6 | -33% |
| Gross margin | 32.0% | 33.3% | - | 31.1% | - |
| Operating income excl JV | 2.1 | 10.5 | -80% | 4.8 | -55% |
| Operating margin excl JV | 4.1% | 20.6% | - | 7.1% | - |
| *Of which Networks* | *6%* | *6%* | - | 8% | - |
| *Of which Global Services* | *3%* | *6%* | - | 6% | - |
| *Of which Support Solutions* | *-1%* | *-1%* | - | 8% | - |
| Operating income incl JV | 2.1 | 9.1 | -77% | -3.8 | - |
| Operating margin incl JV | 4.0% | 17.8% | - | -5.7% | - |
| Net income | 1.2 | 8.8 | -86% | -6.3 | - |
| EPS diluted, SEK | 0.37 | 2.76 | -87% | -1.99 | - |
| EPS (Non-IFRS), SEK[1] | 0.99 | 3.14 | -68% | -1.40 | - |
| Cash flow from operating activities | -3.0 | 0.7 | - | 15.7 | - |
| Net cash, end of period | 32.2 | 37.1 | -13% | 38.5 | -16% |

[1] EPS, diluted, excl. amortizations, write-downs of acquired intangible assets, and restructuring
[2] Q1 2012 includes a gain from the divestment of Sony Ericsson of SEK 7.7 b.

181. The presentation of this financial information—particularly information regarding and/or derived from sales, margins, income and revenue—was false and materially

[11] Unless context indicates otherwise, statements in bold and italics in this section are alleged to be false and misleading, as are statements quoted from Ericsson's disclosures. Additionally, Ericsson's financial metrics—including sales, margins, income and revenue—are also alleged to be false and misleading.

[12] Throughout the Class Period, Ericsson presented its financial information in similar charts in its other reports and SEC filings. These charts are not included herein for the sake of brevity, but such financial information is incorporated by reference herein and was materially false and misleading for substantially the same reasons set forth herein.

misleading, and omitted facts necessary to render such information non-misleading, because: (1) it incorporated data that was tainted by Ericsson's failure to accurately report loss-making contracts; (2) it incorporated data that was tainted by Ericsson's failure to accurately report the costs associated with its contracts; and (3) it incorporated data that was tainted by Ericsson's practices of prematurely recognizing revenue.

182. This information was also false and materially misleading, and omitted material information necessary to render the figures non-misleading, because: (1) Ericsson was taking on loss-making contracts; (2) Ericsson was amassing a large number of loss-making contracts without disclosing that fact; and (3) Ericsson's financial statements regarding its contracts were materially misleading insofar as they were tainted by inaccurate treatment of costs, sales, income, and revenues.

183. Additionally, Ericsson held its 1Q2013 earnings call on April 24, 2013. During his opening remarks at the start of that call, Defendant Vestberg said that the Company would "***of course, continue with our cost and efficiency work***." This statement was false and materially misleading, and omitted facts necessary to be non-misleading, because, as noted, the Company was actively accumulating loss-making contracts, failing to properly define the scope of contracts (which had the effect of understating contract costs), improperly deferring costs, and failing to properly account for costs in accordance with applicable accounting principles.

184. Subsequently, Ericsson reported financial results on the following dates and for the following periods during 2013, all of which incorporated information regarding and/or derived from sales, margins, income and revenue that was false and materially misleading, and

omitted facts necessary to render such information non-misleading, for the same reasons as the statements published on April 24, 2013:

(a) on July 18, 2013, Ericsson published its 2Q2013 results;

(b) on October 24, 2013, Ericsson published its 3Q2013 results, which report additionally included a section attributed to Defendant Vestberg in which he misleadingly represented that "***[t]he momentum for Professional Services continued with stable earnings*** and 59 signed managed services contracts year to date";

(c) on January 30, 2014, Ericsson published its 4Q2013 results; and

(d) on April 8, 2014, Ericsson filed its annual report for 2013 on Form 20-F with the SEC, which was largely comprised of the English version of Ericsson's Swedish Annual Report for 2013 and presented financial information for full year 2013.

185. Additionally, Ericsson held its 2Q2013 earnings call on July 18, 2013, when it published its 2Q2013 results. During that call, an analyst posed a question regarding struggling NRO projects, inquiring: "So how would you assess the risk of actually negative surprise as it hits your P&L as a one-off as these projects are coming to an end in the next six months?" In response, Defendant Frykhammar stated: "The way we operate all our project and project accounting is that ***we update the plan cost estimate on a monthly basis across all projects. And we track variations between actual and plan costs so I would view those additional finalization cost surprises as a quite smaller risk. . . . There is a very detailed review of all of the costs involved in the projects, both actuals as well as planned costs and we adjust the cost levels that we recognized in the P&L all the time***."

186. These statements were false and materially misleading, and omitted facts necessary to be non-misleading, because, in truth, the Company was actively accumulating

loss-making contracts, failing to properly define the scope of contracts (which had the effect of understating contract costs), improperly deferring costs, and failing to properly account for costs in accordance with applicable accounting principles. Moreover, Defendant Frykhammar's admission that Ericsson closely tracked costs evidences Defendants' awareness of the practices detailed herein, including the improper treatment and accounting of costs.

187. Ericsson's April 8, 2014 annual report for 2013 on Form 20-F was signed by Roland Hagman, Vice President Group Function Financial Control at the time, and Nina Macpherson, Senior Vice President, General Counsel, Head of Group Function Legal Affairs, and Secretary to the Board of Directors. The opening letter to the annual report for 2013 filed on Form 20-F from Defendant Vestberg stated "***[w]e will continue to reduce costs and improve efficiency***," while the 2013 Annual Report on Form 20-F otherwise represented: "***A clear focus on operating margins demonstrates our commitment to profitable growth***."

188. These statements were false and materially misleading, and omitted information necessary to render them non-misleading, because, rather than continue to "reduce costs and improve efficiency" or demonstrate a "commitment to profitable growth": (1) Ericsson was taking on loss-making contracts; (2) Ericsson was amassing a large number of loss-making contracts without disclosing that fact; and (3) Ericsson's financial statements regarding its contracts were materially misleading insofar as they were tainted by inaccurate treatment of costs, cost overruns, and revenues such that loss-making contracts were not recognized as losses in the appropriate quarter.

189. The annual report for 2013 filed on Form 20-F also represented "***We have a good balance of [Managed Services] contracts in the transition, transformation and***

***optimization phases – with the vast majority of the business in the optimization phase – which has a beneficial effect on revenue and cash flow.***"

190. This statement was materially misleading because: (1) it claimed that Ericsson had a "good balance" of Managed Services contracts while many of those contracts were loss-making contracts; (2) it claimed that a "vast majority" of Ericsson's Managed Services contracts were in the optimization phase while many of those contracts were loss-making contracts on which Ericsson would never recognize revenue; and (3) Ericsson's financial statements regarding its contracts were materially misleading insofar as they were tainted by inaccurate treatment of costs, cost overruns, and revenues such that loss-making contracts were not recognized as losses in the appropriate quarter.

191. The 2013 Annual Report filed on Form 20-F also stated that:

> ***The Board of Directors and the President declare that the consolidated financial statements have been prepared in accordance with IFRS, as adopted by the EU, and give a fair view of the Group's financial position and results of operations. The financial statements of the Parent Company have been prepared in accordance with generally accepted accounting principles in Sweden and give a fair view of the Parent Company's financial position and results of operations.***

192. Likewise, the 2013 Annual Report filed on Form 20-F stated it was "***prepared in accordance with International Financial Reporting Standards (IFRS) as endorsed by the EU***." It further provided that: "***The consolidated financial statements for the year ended December 31, 2013 have been prepared in accordance with International Financial Reporting Standards (IFRS) as endorsed by the EU***."

193. These representations regarding Ericsson's conformance to IFRS were false and materially misleading because Ericsson's financial statements were not prepared in compliance with such accounting standards and did not give a "fair view" of Ericsson's financial position,

given that such financial information incorporated data: (1) that was tainted by Ericsson's failure to adequately report loss-making contracts; (2) that was tainted by Ericsson's failure to accurately report costs associated with its contracts; (3) that was tainted by Ericsson's practices prematurely recognizing revenue; and (4) that was unreliable due to Ericsson's inadequate internal controls.

194. The 2013 Annual Report filed on Form 20-F further represented that "[t]he profitability of contracts is periodically assessed, and ***provisions for any estimated losses are made immediately when losses are probable.***" This statement was false and omitted material information needed to not be misleading, because: (1) Ericsson did not immediately make provisions for losses when they were probable and instead allowed loss-making contracts to pile-up on its books; (2) Ericsson was failing to accurately report the costs associated with its contracts, which costs would have affected whether or not contracts were in a loss-making position; and (3) Ericsson's financial statements did not reflect a periodical assessment of whether or not its contracts were in a loss-making position.

195. The 2013 Annual Report filed on Form 20-F additionally stated that, with respect to contracts for services, "***Revenue is recognized when the services have been provided, generally pro rata over the contract period***. Global Services has contracts that relate to this type of arrangement." These statements were false because Ericsson did not recognize revenue as stated, because: (1) it prematurely recognized revenue; (2) its revenue recognition processes incorporated data that was tainted by Ericsson's failure to accurately report the costs associated with its contracts; and (3) its revenue recognition processes incorporated data that was unreliable due to Ericsson's inadequate internal controls.

196. Finally, Ericsson's 2013 Annual Report filed on Form 20-F was accompanied by SOX certifications (reproduced above) signed by Defendants Vestberg and Frykhammar. These certifications were materially false and misleading for the following reasons:

(a) The 2013 Annual Report did contain material misstatements and omissions and did not accurately represent the condition of the business, as both Defendants Vestberg and Frykhammar knew. The financial statements contained misstatements and misrepresented the state of the business, as detailed above.

(b) Ericsson did not have internal controls that provided a reasonable assurance regarding the reliability of its financial reporting or its compliance with accounting principles. A system providing reasonable assurances regarding reliability would not have permitted the preparation and publication of financial reports that contained the false and materially misleading information described herein, nor would they have omitted material information necessary to render various representations non-misleading. In fact, Ericsson had glaring weaknesses in its internal controls processes, such as an accounting system that allowed individuals to recognize revenue "with just a few keystrokes."

197. As detailed below, Ericsson made similar false and misleading statements and omissions throughout the rest of the Class Period during years 2014, 2015, 2016 and 2017– statements and omissions that were false and misleading for substantially similar reasons as those set forth in this section.

**B. Reporting on the Year 2014**

198. Like its financial reporting for 2013, Ericsson's financial reporting for 2014 presented and incorporated information regarding and/or derived from sales, margins, income and revenue that was false and materially misleading, and omitted information necessary to render such data non-misleading, for the same reasons as the financial information reported for

2013. The Company reported financial results on the following dates, and for the following periods, for 2014:

(a) on April 23, 2014, Ericsson published its 1Q2014 results, which included information on Ericsson's Global Services segment;

(b) on July 18, 2014, Ericsson published its 2Q2014 results. The report included assurances from the Board of Directors that "***The Board of Directors and the CEO certify that the financial report for the six months gives a fair view of the performance of the business***";

(c) on October 24, 2014, Ericsson published its 3Q2014 results, including the following representation from Defendant Vestberg: "***Profitability showed stable improvement across all segments. This was primarily driven by favorable business mix***";

(d) on January 27, 2015, Ericsson published its 4Q2014 results, including the following representation from Defendant Vestberg: "***Operating margin improved in the core business driven by higher share of capacity sales and efficiency enhancements***"; and

(e) on March 31, 2015, Ericsson filed its Form 20-F with the SEC which was largely comprised of the English version of Ericsson's Swedish Annual Report for 2014 and presented financial information for full year 2014.

199. The financial information reported on those dates was false and materially misleading, and omitted information necessary to be non-misleading, because: (1) it incorporated data that was tainted by Ericsson's failure to accurately report loss-making contracts; (2) it incorporated data that was tainted by Ericsson's failure to accurately report the costs associated with its contracts; and (3) it incorporated data that was tainted by Ericsson's practices of prematurely recognizing revenue.

200. Additionally, this financial information and the statements above regarding the "favorable business mix" and "improved" margins were false and materially misleading, and omitted material information necessary to be non-misleading, because: (1) Ericsson was taking on loss-making contracts; (2) Ericsson was amassing a large number of loss-making contracts without disclosing that fact; and (3) Ericsson's financial statements regarding its contracts were materially misleading insofar as they were tainted by inaccurate treatment of costs, sales, income, and revenues.

201. On January 27, 2015, Ericsson held its 4Q2014 earnings conference call. During the call, analyst asked whether the Company was engaging in "Pull Ins" to prematurely recognize certain sales. Defendant Frykhammar rejected this notion, saying: "***we are a company that are a [sic] very prudent in terms of accounting, so the concept of pull-ins I don't really understand***." But Defendant Frykhammar's representations were flatly untrue. As detailed herein, Ericsson regularly engaged in aggressive and improper accounting practices that violated applicable accounting principles, failed to accurately portray the Company's financial condition, and otherwise concealed the Company's improper business practices and the effects those practices were having (and would have) on the Company's financials.

202. Furthermore, the 2014 Annual Report filed on Form 20-F—which was signed by Roland Hagman, Vice President Group Function Financial Control at the time, and Nina Macpherson, Senior Vice President, General Counsel, Head of Group Function Legal Affairs, and Secretary to the Board of Directors—contained other representations that were false and materially misleading for substantially similar reasons, as follows:

(a) The opening letter of the 2014 Annual Report filed on Form 20-F stated: "***Going into 2015, we aim to continue to grow faster than the market combined with best-in-class margins and strong operating cash flow***."

(b) The 2014 Annual Report filed on Form 20-F, in reference to Ericsson's profit margins, stated "A market-leading position, global presence, regional and local competence as well as close customer relationships ***provide a solid foundation for profitable growth.***"

(c) The 2014 Annual Report filed on Form 20-F stated "***A strong financial position, focus on profitable growth and operational efficiencies and the ambition to improve earnings in the core business remain the cornerstones of Ericsson's financial ambitions while continuously monetizing the footprint and making cost efficiency improvements.***"

(d) The 2014 Annual Report filed on Form 20-F stated "***The strategy is to excel in the core business,*** establish leadership in targeted areas and expand business in new areas."

(e) The 2014 Annual Report filed on Form 20-F stated "***The Company has reached a good balance of contracts . . .***" in the Managed Services segment.

(f) The 2014 Annual Report filed on Form 20-F stated it had the ability to "***limit[] the negative impact on cash flow in the transition phase when going into new contracts.***"

(g) The 2014 Annual Report filed on Form 20-F stated "***The business strategy within Global Services is to extend and excel in the core business: network roll-out, customer support, and managed services . . . .***"

(h) The 2014 Annual Report filed on Form 20-F stated "***Within Global Services, Managed Services and Consulting & Systems Integration continue to drive growth.***"

203. The above statements were false and materially misleading, and omitted material information necessary to render such statements non-misleading, because: (1) Ericsson continued taking on loss-making contracts; (2) Ericsson was amassing a large number of loss-making contracts without disclosing that fact; and (3) Ericsson's financial statements regarding its contracts were materially misleading insofar as they were tainted by inaccurate treatment of costs and revenues such that loss-making contracts were not recognized as losses in the appropriate quarter. Nor, for these reasons, was it true that Managed Services was driving growth.

204. Like the 2013 Annual Report filed on Form 20-F, the 2014 Annual Report filed on Form 20-F also represented that the financial statements provide a fair view of the Company's financial position, results of operations, and risks and uncertainties and were otherwise prepared in conformance with IFRS. Similarly, the 2014 Annual Report provided solid examples of how the Company complied with IFRS, representing, in part, that: (1) "[t]he profitability of contracts is periodically assessed, and ***provisions for any estimated losses are made immediately when losses are probable***"; and (2) "***Revenue is recognized when the services have been provided, generally pro rata over the contract period***."

205. In truth, for the reasons detailed herein, Ericsson's financial statements and results were not prepared in accordance with, and did not conform, to IFRS and did not provide a fair view of the Company's financial position. For example, as explained herein, Ericsson did not immediately make provisions for losses when they were probable and failed to

accurately report the costs associated with its contracts, while prematurely recognizing revenue.

206. Finally, Ericsson's 2014 Annual Report filed on Form 20-F was also accompanied by SOX certifications signed by Defendants Vestberg and Frykhammar, which were false and materially misleading for the same reasons as the other SOX certifications issued throughout the Class Period.

**C. Reporting on the Year 2015**

207. Like its financial reporting for 2013 and 2014, Ericsson's financial reporting for 2015 presented and incorporated information regarding and/or derived from sales, margins, income and revenue that was false and materially misleading, and omitted information necessary to render such data non-misleading, for the same reasons as the financial information reported for 2013 and 2014. The Company reported financial results on the following dates, and for the following periods, for 2015:

(a) on April 23, 2015, Ericsson published its 1Q2015 results, which included comments from Defendant Vestberg stating that "***[t]here is continued good progress in returning the Network Rollout business to profitability and its operating margin***";

(b) on April 23, 2015, Ericsson released an earnings press release and analyst presentation, in which Defendant Frykhammar stated that in regards to "***network rollout, margin is improving, the professional services, margin is improving***";

(c) on July 17, 2015, Ericsson published its 2Q2015 results, which included comments from Defendant Vestberg stating that "***Our growth strategy builds on a combination of excelling in our core business and establishing leadership in targeted growth areas***" and represented that "***[t]he work to return the Network Rollout business to profitability continues with good progress and operating margin***";

(d) On July 17, 2015, Ericsson released an earnings press and analyst presentation, in which Defendant Frykhammar answered an analyst's question regarding an "increased loss" from the network rollout by stating "***I think the trend is going in the right direction***";

(e) on October 23, 2015, Ericsson published its 3Q2015 results, which included comments from Defendant Vestberg and stated that "***Operating income and margin improved in Global Services YoY. Operating margin . . . driven by an improved income in Network Rollout and increased sales in Professional Services***";

(f) on January 27, 2016, Ericsson published its 4Q2015 results, which included comments from Defendant Vestberg stating that "***The effort to restore Network Rollout to a sustainable profitable business is progressing well***";

(g) on March 7, 2016, Ericsson published its 2015 Swedish Annual Report, and opened with a letter to investors signed by Defendant Vestberg; and

(h) on April 4, 2016, Ericsson filed its Form 20-F with the SEC, attaching the Company's 2015 Swedish Annual Report as exhibit 15.1.

208. The financial information reported on those dates was false and materially misleading, and omitted facts necessary to render such information non-misleading, because: (1) it incorporated data that was tainted by Ericsson's failure to accurately report loss-making contracts; (2) it incorporated data that was tainted by Ericsson's failure to accurately report the costs associated with its contracts; and (3) it incorporated data that was tainted by Ericsson's practices of prematurely recognizing revenue.

209. This information—as well as the non-financial related statements above—was also false and materially misleading, and omitted material information necessary to render such

information and statements non-misleading, because: (1) Ericsson was taking on loss-making contracts; (2) Ericsson was amassing a large number of loss-making contracts without disclosing that fact; and (3) Ericsson's financial statements regarding its contracts were materially misleading insofar as they were tainted by inaccurate treatment of costs, sales, income, and revenues such that loss-making contracts were not recognized as losses in the appropriate quarter.

210. Additionally, the 2015 Swedish Annual Report—which was signed by Defendants Vestberg and Ekholm, among others—and the 2015 Annual Report filed on Form 20-F—which was signed by Roland Hagman and Nina Macpherson, who at the time held the titles at Ericsson of Vice President Group Controller and Senior Vice President Chief Legal Officer, respectively—contained other representations that were false and materially misleading for substantially similar reasons, as follows:

(a) The opening letter of the Swedish Annual Report stated that: "***Our core strategy remains unchanged and builds on a combination of excelling in our current core business and to establish leadership in targeted growth areas, combined with best-in-class margins and strong operating cash flow***."

(b) The opening letter of the Swedish Annual Report stated that: "***Our global cost and efficiency program is progressing according to plan and operating expenses for the second half of 2015 declined by almost 10%***."

(c) The Swedish Annual Report stated that: "***Ericsson has made progress in its efforts to improve the profitability of network rollout services and industrialize the business***."

(d) The Swedish Annual Report stated that ***75%*** of the Company's managed services contracts were in the profitable "optimization" phase and that these contracts had a "***beneficial effect on earnings and cash flow.***"

(e) While discussing Managed Services, Ericsson's annual report explained that such contracts tend to have greater costs in their initial phases and that such contracts are of highest margin at later phases in the project. The Swedish Annual Report stated that: "***[T]he Company has advanced on the learning curve, which means that global synergies can be obtained, and thereby the initial phases can be shortened. This limits the negative impact on cash flow in the transition phase when entering into new contracts***."

211. The above statements were false and materially misleading, and omitted material information necessary to render them non-misleading, because: (1) Ericsson continued taking on loss-making contracts; (2) Ericsson was amassing a large number of loss-making contracts, such that many of its contracts would never be profitable at any stage of their life-cycle, without disclosing those facts; and (3) Ericsson's financial statements regarding its contracts were materially misleading insofar as they were tainted by inaccurate treatment of costs and revenues such that loss-making contracts were not recognized as losses in the appropriate quarter.

212. Furthermore, the opening letter contained statements that were false and omitted material information because: (1) it claimed that Ericsson had "best-in-class margins" and that the "global cost and efficiency program [was] progressing according to plan," while failing to disclose that Ericsson was amassing negative margin contracts and was failing to accurately report the costs associated with its contracts in ways that affected its margins; (2) it claimed that Ericsson had "best-in-class margins," while failing to disclose that reported margins were

affected by the premature recognition of revenue; and (3) it claimed that Ericsson's "core strategy remains unchanged," when Ericsson had adopted an undisclosed strategy of aggressively taking on low-margin or negative-margin contracts.

213. Like the 2013 and 2014 annual reports filed on Form 20-F, the 2015 Annual Reports also represented that the financial statements provide a fair view of the Company's financial position, results of operations, and risks and uncertainties and were otherwise prepared in conformance with IFRS. Similarly, the 2015 Annual Reports provided solid examples of how the Company complied with IFRS, representing, in part, that: (1) "[t]he profitability of contracts is periodically assessed, and ***provisions for any estimated losses are made immediately when losses are probable***"; and (2) "***Revenue is recognized when the services have been provided, generally pro rata over the contract period***." These statements were false and misleading for the same reasons as the substantially similar, if not identical, statements in the Company's other annual reports.

214. Finally, Ericsson's 2015 Annual Report filed on Form 20-F was also accompanied by SOX certifications signed by Defendants Vestberg and Frykhammar, which were false and materially misleading for the same reasons as the other SOX certifications issued throughout the Class Period.

## D. Reporting on the Year 2016 & SvD Article Response

### 1. April 21, 2016—Ericsson Publishes 1Q2016 Results

215. On April 21, 2016, Ericsson published its 1Q2016 results, which presented and incorporated information regarding and/or derived from sales, margins, income and revenue that was false and materially misleading, and omitted facts necessary to render such information non-misleading, for the same reasons as Ericsson's previously reported financial information during the Class Period.

216. Additionally, the financial report included a letter from Defendant Vestberg stating that "***Professional Services sales were stable with growth in Consulting and Systems Integration driven by transformation projects and stable Managed Services sales with 21 contracts signed in the quarter***." Furthermore, during the morning conference call associated with Ericsson's 1Q2016 results, hosted by Defendants Frykhammar and Vestberg, Defendant Frykhammar stated:

> So network rollout, that was mainly due to lower activity. ***The underlying margin continues to be good, so this is mainly under-absorption. I hope everyone understands what we mean by that. And then you have the operating margin in professional services***. That was weak in the quarter. And that is also -- part of it is related to under-absorption as well, ***but most of it is what I would call growing pains***.

217. These statements were false and materially misleading, and omitted information necessary to be non-misleading, because: (1) they spoke positively of the NRO business' margins, while failing to disclose that Ericsson was amassing negative margin contracts and was failing to accurately report the costs associated with the Company's contracts; and (2) they attributed low margins in the Professional Services business—which included Managed Services—to "growing pains" without disclosing that Ericsson was amassing negative margin contracts and was failing to accurately report the costs associated with its contracts.

218. On April 21, 2016, Ericsson also published a press release, stating that the Company "***remains fully committed to drive cost reduction and efficiencies, including delivering on its SEK 9 b. net savings efficiency program during 2017***." This statement was likewise false and materially misleading, and omitted facts necessary to render it non-misleading, because it claimed that Ericsson was committed to cost reduction while failing to

disclose that Ericsson was amassing negative margin contracts and was failing to accurately report the costs associated with its contracts.

### 2. July 18, 2016—Ericsson Publishes Response to the SvD Article

219. On July 17, 2016, the SvD article stated that concerns were growing internally within Ericsson regarding the Company's use of aggressive accounting. As detailed herein, the article chronicled the Company's business practice of prematurely recognizing revenue.

220. On July 18, 2016, Ericsson posted a response to the SvD article on its website, in which it denied having prematurely recognized revenue and represented: "***The claim that Ericsson in a wrongful way has reported income in its accounting is not correct[.]***" In the same response, Ericsson further represented, in pertinent part, as follows:

> ***The claim that Ericsson in a wrongful way has reported income in its accounting is not correct. The principle for revenue recognition is described in the company's annual report in note C1, Significant accounting policies, p. 63 and onwards[.]***
>
> ***Revenue is recognized when risks and rewards have been transferred to the customer, with reference to all significant contractual terms, when:***
>
> - ***The product or service has been delivered***
> - ***The revenue amount is fixed or determinable***
> - ***The customer has received and activation has been made of separately sold software***
> - ***Collection is reasonably assured***
>
> ***Estimations of contractual performance criteria impact the timing and amounts of revenue recognized and may therefore defer revenue recognition until the performance criteria are met. Regarding frame agreements and longer services contracts, the following applies: Distribution and/or accrual related to criteria for delivery-type contracts, ie contracts that relate to delivery, installation, integration of products and provision of related services, normally under multiple elements contracts. Under multiple elements contracts, accounting is based on that the***

> ***revenue recognition criteria are applied to the separately identifiable components of the contract*.**

221. These statements—including Ericsson's wholesale denial of having engaged in the premature recognition of revenue—were false and materially misleading, and omitted facts necessary to be non-misleading, because Ericsson: (1) claimed it was "not correct" that the Company had reported income "in a wrongful way," when in fact the Company had an ongoing practice of prematurely recognizing revenue without disclosing the conduct that resulted in such improper accounting practices; (2) addressed the allegation that Ericsson's "accounting is inflated," while failing to disclose that Ericsson was prematurely recognizing revenue, amassing negative margin contracts, and failing to accurately report the costs associated with its contracts; and (3) described the accounting principles that Ericsson purported to follow, which the Company regularly violated.

222. Accordingly, Defendants continued to conceal Ericsson's pervasive and improper cost accounting and revenue recognition practices even after having caused the Company to post a response to the SvD article, which continued to mislead investors regarding the scope of the Company's misconduct.

### 3. July 19, 2016—Ericsson Publishes 2Q2016 Results

223. On July 19, 2016, Ericsson published its 2Q2016 results, which presented and incorporated information regarding and/or derived from sales, margins, income and revenue that was false and materially misleading, and omitted facts necessary to render such information non-misleading, for the same reasons as Ericsson's previously reported financial information during the Class Period.

224. The July 19, 2016 report included a letter from Defendant Vestberg, stating: "***Actions have been implemented to restore Global Services profitability . . . Losses in***

***Network Rollout have been significantly reduced and the operating margin, excluding restructuring charges, for Professional Services has gradually improved to 10% in the quarter***." The letter also stated that "***[t]o manage the lower demand for mobile broadband investments, a set of significant actions has been initiated to further drive efficiency improvements and reduce cost***." Additionally, the report itself stated that "***Global Services operating income improved significantly driven by rightsizing activities in service delivery operations and performance improvement in transformation projects***."

225. These statements were false and materially misleading, and omitted information necessary to render such statements non-misleading, because they conveyed the impression that Ericsson had taken affirmative steps to reduce costs and was otherwise committed to reducing costs, while failing to disclose that Ericsson was amassing negative margin network rollout contracts and was failing to accurately report the costs associated with its contracts.

226. During the conference call associated with Ericsson's 2Q2016 results, hosted by Defendants Frykhammar and Vestberg, Defendant Frykhammar discussed the SvD article, acknowledging that it reported that "Ericsson had made the incorrect accounting on certain items." Indicating that "that was something that really made both Hans and myself [sic] very upset," he indicated that the Company had responded with a website post and represented that it "was very important for Hans and me to clearly make a statement." Lastly, he reiterated the primary point of the Company's comment on the article, stating: "***That article had very many faults in it and it was incorrect***."

227. In truth, however, the article accurately detailed Ericsson's aggressive accounting practices and premature revenue recognition—a fact about which investors

remained in the dark until the Company later announced the need for significant provisions to compensate for such practices.

**4. October 21, 2016—Ericsson Publishes 3Q2016 Results**

228. On October 21, 2016, Ericsson published its 3Q2016 results, which presented and incorporated information regarding and/or derived from sales, margins, income and revenue that was false and materially misleading, and omitted facts necessary to render such information non-misleading, for the same reasons as Ericsson's previously reported financial information during the Class Period.

229. The October 21, 2016 report included a letter from Defendant Frykhammar, stating: "***The positive effect of the cost and efficiency program did not offset the sharp decline in gross income***." This statement was false and materially misleading, and omitted facts necessary for it to be non-misleading, because it claimed that Ericsson's "cost and efficiency program" was having "positive effects," while failing to disclose that Ericsson was amassing negative margin contracts and was failing to accurately report the costs associated with its contracts.

**5. January 26, 2017—Ericsson Publishes 4Q2016 Results**

230. On January 26, 2017, Ericsson published its 4Q2016 results, which included a letter from Defendant Ekholm and presented and incorporated information regarding and/or derived from sales, margins, income and revenue that was false and materially misleading, and omitted facts necessary to render such information non-misleading, for the same reasons as Ericsson's previously reported financial information during the Class Period.

### 6. March 3, 2017 and April 26, 2017—Ericsson Publishes 2016 Annual Report

231. On March 3, 2017, Ericsson published its 2016 Swedish Annual Report. The 2016 Swedish Annual Report was signed by Defendant Ekholm, among others, and the report opened with a letter to investors signed by Defendant Ekholm. Subsequently, on April 26, 2017, Ericsson filed its Form 20-F with the SEC, attaching the Company's 2015 Swedish Annual Report as exhibit 15.1. The Form 20-F was signed by Roland Hagman and Nina Macpherson, who at the time held the titles at Ericsson of Vice President Group Controller and Senior Vice President Chief Legal Officer, respectively.

232. These annual reports presented and incorporated information regarding and/or derived from sales, margins, income and revenue that was false and materially misleading, and omitted facts necessary to render such information non-misleading, for the same reasons as the financial information reported previously during the Class Period.

233. Additionally, the 2016 Annual Reports contained other representations that were false and materially misleading for substantially similar reasons, as follows:

(a) The 2016 Swedish Annual Report stated that "***In the near term, this means we prioritize profitability over growth***."

(b) The 2016 Swedish Annual Report stated that "***To adapt operations to a lower mobile broadband market, the Company has intensified actions to reduce cost of sales further***."

(c) The 2016 Swedish Annual Report stated that "***In telecom services, the Company monetizes its strong global footprint in managed services, with more than 300 ongoing contracts***."

(d) The 2016 Swedish Annual Report stated that "***The Company believes that it has reached a good balance of contracts in the transition, transformation and optimization phases***."

(e) The 2016 Swedish Annual Report stated that "***During 2016, the market situation became increasingly challenging, mainly driven by a weak macro-economic environment. As a result, the Company increased its focus on improving profitability***."

(f) The 2016 Swedish Annual Report stated that "***The global cost and efficiency program, first initiated in November 2014, and expanded in 2016, progressed according to plan***."

(g) The 2016 Swedish Annual Report stated that "***The effort to improve Network Rollout profitability continues through efficiency improvements including implementation of global methods and tools***."

234. The above statements were false and materially misleading, and omitted material information necessary to be non-misleading, because: (1) Ericsson continued taking on loss-making contracts; (2) Ericsson was amassing a large number of loss-making contracts, such that many of its contracts would never be profitable at any stage of their life-cycle, without disclosing those facts; and (3) Ericsson did not prioritize profitability or cost cutting over growth and instead took on loss-leading and loss-making contracts.

235. Furthermore, while describing Ericsson's Managed Services business, the 2016 Swedish Annual Report stated that:

> The Managed Services business model includes three phases. The initial phase, the transition, is coupled with lower profitability, as it involves up-front costs when staff and expertise are transferred from the customer to Ericsson. In the second phase, the transformation phase, Ericsson introduces its global processes, methods and tools and implements a global delivery model. ***In the***

> ***third phase, Ericsson focuses on optimization and industrialization by simplifying, implementing and consolidating resources, processes, methods and tools to allow for improved profitability.*** Managed services contracts are normally 5-7 years long. ***The first two phases last for 1-1.5 years while the optimization phase represents the remainder of the contract period.***

236. These statements were false and materially misleading, and omitted material facts necessary to be non-misleading, because they assured investors that Managed Services contracts operated with improved profitability after 1-1.5 years, when many of them were loss-leading and loss-making contracts that would never be profitable. The assurance is striking when compared to the prior sentence, which also gives a range of years (for the entirety of the contract) but prefaces that statement with the qualifying word "normally." The prior paragraph in the 2016 Annual Report also described other contracts in several phases and qualified each term with the word "normally."[13]

237. Like the 2013, 2014 and 2015 annual reports filed on Form 20-F, the 2016 Annual Reports also represented that the financial statements provide a fair view of the Company's financial position, results of operations, and risks and uncertainties and were otherwise prepared in conformance with IFRS. Similarly, the 2016 Annual Reports provided solid examples of how the Company complied with IFRS, representing, in part, that: (1) "[t]he profitability of contracts is periodically assessed, and ***provisions for any estimated losses are made immediately when losses are probable***"; and (2) "***Revenue is recognized when the services have been provided, generally pro rata over the contract period***."

---

[13] The relevant portion of that prior paragraph, which does not relate to Managed Services, states: "When the network is up and running and demands for capacity expansions and quality improvements arise, profitability increases, driven by an increased share of software sales, network densification and less complex hardware installations, network optimization and customer support. This phase is called the capacity phase. The coverage phases are ***normally*** 1–2 years while the capacity phase lasts until the equipment is phased out, ***normally*** after 7–10 years in operation." (Emphasis added).

238. In truth, for the reasons detailed herein, Ericsson's financial statements and results were not prepared in accordance with, and did not conform, to IFRS and did not provide a fair view of the Company's financial position. For example, as explained herein, Ericsson did not immediately make provisions for losses when they were probable and failed to accurately report the costs associated with its contracts, while prematurely recognizing revenue.

239. Finally, Ericsson's 2016 Annual Report on Form 20-F was accompanied by SOX certifications signed by Defendants Ekholm and Mellander, which were false and materially misleading for the same reasons as the other SOX certifications issued throughout the Class Period.

## E. Disclosures of Provisions and 1Q2017 Results

### 1. Initial Disclosure of Contract Provisions

240. On March 28, 2017, Ericsson issued a press release entitled "Ericsson presents focused business strategy," in which the Company stated that "provisions of an estimated SEK 7-9 b. will be required in Q1, triggered by recent negative developments related to certain large customer projects."

241. On the morning of March 28, 2017, in connection with the previously mentioned press release, Ericsson hosted a conference call with financial analysts. Defendant Ekholm and Peter Nyquist ("Nyquist"), Vice President of Investor Relations at Ericsson, participated in the call, which was introduced as "Ericsson's Analyst and Media Conference Call." During the call, an analyst asked if the provisions related to "1 or 2 isolated incidents" in an attempt to understand how far-reaching the issues were within Ericsson. Defendant Ekholm responded:

> ***What we feel is that is for some very specific contracts and few compared to the total portfolio***, but where we see that we need to allocate more resources in order to deliver on the projects. And that's why we make the provision. ***And I think it should be viewed as isolated incidents***, and things like that happens when you deliver new technology. And it's unfortunate, and of course, we should avoid them. But that's why we make the provision.

242. During the conference call, an analyst asked whether Ericsson intends to remain in the line of business where the provisions occurred and whether it was a "structural problem." He framed the question in the negative asking: "It's not a structural problem . . ." and Defendant Ekholm responded, "***Exactly***."

243. Additionally, on the afternoon of March 28, 2017, in connection with the previously mentioned press release, Ericsson hosted a conference call with financial analysts. Defendants Ekholm and Mellander, as well as Nyquist, participated in the call, which was introduced as "Ericsson's Analyst and Media Conference Call." During the morning session of the conference call, Defendant Ekholm stated that "we're taking some provisions on contracts that we're -- that ***we have seen during Q1***." He further represented, during the afternoon session, that:

> In addition, we have reviewed our contract portfolio and project portfolio. ***And what we see here is that due to some specific events related to certain large customer projects, we have a need to take a provision of SEK 7 billion to SEK 9 billion in Q1***. ***I would say here, we have a fairly large -- or large number of projects ongoing, and these are specific and certain of the large ones that we're taking the provision against***.

244. Although these statements partially revealed the Company's precarious position and questionable accounting practices, they nevertheless conveyed the materially misleading impression that the issues requiring the provisions and related to the provision were narrowly confined to the few specific contracts at issue, when those issues were in fact of far wider breadth—and the statements still failed to disclose, and rather actively concealed, that Ericsson

was amassing negative margin contracts and was failing to accurately report the costs associated with its contracts in ways that affected its financial performance and metrics.

### 2. April 25, 2017—1Q2017 Financial Results

245. On April 25, 2017, Ericsson published its 1Q2017 results, which included a letter from Defendant Ekholm. The financial information reported was false and materially misleading, and omitted facts necessary to render such information non-misleading, because: (1) it incorporated data that was tainted by Ericsson's failure to accurately report loss-making contracts; (2) it incorporated data that was tainted by Ericsson's failure to accurately report the costs associated with its contracts; and (3) it incorporated data that was tainted by Ericsson's practices of prematurely recognizing revenue.

246. On April 25, 2017, in connection with the previously mentioned press release, Ericsson hosted a conference call with financial analysts. Defendant Ekholm, Defendant Mellander, and Nyquist participated in the call, which was introduced as "Ericsson's Analyst and Media Conference Call." During the morning conference call, Defendant Mellander stated that: "When it comes to the provisions and adjustments that are related to customer contract, these are really triggered by some negative development that occurred late in the quarter. And this relates to certain specific customer contracts . . . ."

247. During the conference call, an analyst asked "And how many projects do we talk about?" Defendant Mellander responded:

> ***It's a limited number of projects***. And we have thoroughly gone through business cases and estimated the need and to make provisions for cost that we don't believe will be recovered. Of course, this is a project business and certain uncertainty, this is, by nature, a provision which is an estimate based on all the available inside facts and plans that we have.

248. In the afternoon of April 25, 2017, Ericsson hosted another conference call with financial analysts. Defendant Ekholm, Defendant Mellander and Nyquist participated in the call, which was introduced as "Ericsson's Analyst and Media Conference Call." During the call, Defendant Mellander said: "part of the SEK 8.4 billion also [involves] provisions in connection with ***some specific projects***." He further stated: "When it comes to the write-offs and the provisions that you talked about that, ***it's really related to some specific customer commitments and contracts*** that we have where we have had negative development in those contracts."

249. During the conference call an analyst asked, "in terms of your contracts, do you anticipate any further provisions as some of your other customers try to renegotiate them?" And Defendant Mellander said:

> ***When it comes to further provisions, I would say, I mean, by definition, what we have visibility on now is what we have taken action on in the quarter.*** So all the provisions we have done is based on our assessment of the current situation. And this is all we have visibility on now. Of course, as in any project business, you don't know if this is -- it has an inherent risk to it, of course, this type of business. But we don't have any more visibility into that at the moment.

250. Although these statements further partially revealed the Company's precarious position and questionable accounting practices, they nevertheless conveyed the materially misleading impression that the issues requiring the provisions and related to the provision were narrowly confined to the few specific contracts at issue, when those issues were in fact of far wider breadth—and the statements still failed to disclose, and rather actively concealed, that Ericsson was amassing negative margin contracts and was failing to accurately report the costs associated with its contracts in ways that affected its financial performance and metrics.

251. As detailed herein, it was not until July 17, 2017 that Defendants finally revealed information sufficient to apprise investors of the panoply of accounting improprieties in which Ericsson had engaged during the Class Period.

**F. Ericsson Mispresented Information Regarding Scoping and Thereby Assumed a Duty to Disclose Its Scoping and Revenue Recognition Practices**

252. In the 2013, 2014, 2015 and 2016 Annual Reports, Ericsson addressed its Managed Services business, noting "[c]ontracts for such services normally cover several years and generate recurring revenues." Yet the Company also represented that "***contracts have been, and may in the future be, terminated or reduced in scope***, which has negative impacts on sales and earnings." These statements, taken together and in context, conveyed the materially misleading impression that Ericsson's long-term and other contracts were predominately susceptible to ***termination*** or a ***reduction in scope***.

253. In truth, when issuing these statements, the Company was consistently and regularly improperly scoping contracts at their inception, which presented the substantial likelihood—indeed, the ***certainty***—that the contract price and revenues promised under the contract could not adequately compensate for the tremendous costs the Company would shoulder to perform the contract as their scopes dramatically expanded. Accordingly, Ericsson flatly misrepresented its true business practice in representing that contracts were largely at risk of termination or a reduction in scope, because, in actuality, the reverse was true: the Company's current contracts were experiencing—and future contracts were at risk of—exponential scope increases as performed, all of which had negatively impacted, and was negatively impacting and threatening, sales and earnings (and related financial metrics).

254. Additionally, by addressing the scope of its contracts and the ramifications of contract termination or a reduction in scope, Ericsson's statements gave rise to an obligation to

disclose its business practice of improperly scoping contracts and prematurely recognizing revenue—and the historical, current and expected consequences of such conduct on the Company's operations, condition, and financial performance.

### G. Ericsson Had an Independent and Affirmative Obligation to Disclose Trends and Uncertainties in Its Forms 20-F During the Class Period

255. Item 5 of Form 20-F—entitled "Operating and Financial Review and Prospects"—calls for "management's explanation of factors that have affected the company's financial condition and results of operations for the historical periods covered by the financial statements, and management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods."

256. Item 5.D of Form 20-F—entitled "Trend information"—requires a company to "discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition."

257. As detailed herein, Ericsson's increasing reliance on loss-leading contracts—which were improperly scoped from inception—constituted a known trend that required disclosure and threatened to materially impact, and actually materially impacted, the Company's financial condition and results of operation when the Company could no longer carry the contracts on its books. Likewise, Ericsson's continued, premature recognition of revenue constituted a known trend for substantially the same reasons—and threatened the

reversal of substantial amounts of revenue, if not the need to record provisions and related write-downs, possibly all in a single quarter.

258. Moreover, Ericsson's pervasive accounting and contract management practices—whereby the Company understated and deferred significant contract costs and prematurely recognized revenue—presented known uncertainties, given the deleterious impacts those practices could (and did) have on the Company if (and when) it could no longer sustain them or stave off their consequences.

259. Item 303 of SEC Regulation S-K also required disclosure of information concerning such trends and uncertainties, and, even if not applicable to Ericsson, should and would have informed its disclosure obligations.

260. Accordingly, Ericsson had an independent and affirmative obligation to disclose information concerning these trends and uncertainties—and their potential financial impact—in its Forms 20-F throughout the Class Period. The failure to disclose such information rendered the Forms 20-F during the Class Period false and materially misleading—not only because such nondisclosure conveyed the impression to investors that the Company had already disclosed all required information concerning such trends and uncertainties, but also because the omission of such information was materially misleading in and of itself.

## VII. ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER

261. At all relevant times, Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein. Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial

direct and circumstantial evidence supporting a strong inference of scienter, as discussed above and herein.

262. The Individual Defendants, by virtue of their knowledge of the true facts regarding Ericsson, their control over, receipt, and/or modification of Ericsson's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Ericsson, participated in the fraudulent scheme alleged herein. The scheme deceived the investing public regarding Ericsson's business, operations, and management, as well as the intrinsic value of Ericsson's securities, and caused Plaintiffs and members of the Class to purchase Ericsson's ADS at artificially inflated prices.

### A. The Fraud Was a Widespread and Pervasive Corporate Scheme Directed from the Highest Levels of Management

263. As detailed herein, former Ericsson employees have provided corroborating accounts of the Company's widespread business practice, openly endorsed and directed by management, of improperly scoping contracts intentionally for the purpose of gaining market share, pushing costs into the future, and prematurely recognizing revenue.

264. For example, FE 1 explained that pushing costs into future quarters was a "normal practice" at the Company, and that contracts involving Verizon—one of Ericsson's largest customers—were "notorious" for having costs pushed out, while it was also common to defer quarterly costs on AT&T projects. Moreover, multiple former employees—including FEs 1, 2, 3 and 5—were familiar with the "Feed the Gorilla" campaign, an aggressive internal directive approved by Ericsson's Head of North America, which prioritized signing contracts at any cost above prudent risk management and scoping at the outset of a project. Additionally, FE 7 indicated that the decision to take on low to no margin Managed Services projects was

made by Swedish headquarters—where all of the Individual Defendants worked. In fact, FE 6 confirmed that Defendants Vestberg and Mandersson were personally involved in negotiations with global carriers such as France Telecom and Verizon.

265. Furthermore, the FEs worked in locations spread around Ericsson's worldwide operations, which lends credibility to their accounts and provides increased assurance of their reliability in having access to facts concerning the fraudulent scheme alleged herein.

266. Finally, Ericsson could not have perpetrated the illicit business practices described herein—including improperly scoping contracts and pushing out costs, purposely aggregating money-losing contracts, and prematurely recognizing revenue—without the involvement, input or approval of management or other executives authorized to direct the Company's business.

267. Moreover, the Individual Defendants and/or others with authority and control over the Company authored, issued and/or approved the dissemination of the misleading statements identified herein, or otherwise caused the Company to withhold information the Company had an obligation to produce (whether such information was necessary to render certain statements non-misleading or otherwise). Accordingly, the scienter of the individuals who authorized, directed and carried out these business practices and disclosures is imputed to Ericsson—even if their identities are not now known—under the corporate scienter doctrine.

268. For the avoidance of doubt, in addition to imputing the Individual Defendant's knowledge and information to Ericsson, the Company is also imputed with the knowledge of its other employees—including Geha, head of the Managed Services business.

### B. Defendants Had Access to and Reviewed Information Concerning Ericsson's Long-Term Contracts

269. Defendants admitted that they periodically reviewed the costs and losses associated with long-term contracts and that they periodically reviewed whether any provisions or write-downs were necessary. In fact, as detailed herein, Defendants affirmatively represented in the annual reports throughout the Class Period that "profitability of contracts is periodically assessed, and provisions for any estimated losses are made immediately when losses are probable."

270. The FEs also confirmed that Defendants received and reviewed information concerning the long-term contracts at the center of the fraudulent course of conduct alleged, and the Individual Defendants who signed the SOX certifications attested to the effectiveness of the Company's internal controls—controls designed to ensure that management was aware of all material information concerning the Company.

### C. The Magnitude of the Fraud and the Timing of the Provisions and Write-Downs Support Scienter

271. The magnitude and timing of the provisions announced and recorded during the Class Period also support a strong inference of scienter.

272. As if the Company's intentional practice of improperly scoping contracts was not enough to establish that Defendants knew the Company regularly entered into money-losing contracts, FE 5 confirmed that Ericsson would have known six to twelve months after starting a project that there would be cost overruns.

273. The necessary provisions were also enormous. On March 28, 2017, Ericsson revealed that it would be taking provisions between SEK 7-9 billion ($900 million to $1.16 billion)—a number later confirmed, on April 25, 2017, at SEK 8.4 billion ($1.08 billion). This provision was significantly ***more than four times Ericsson's entire 2016 profit*** and more than

half of Ericsson's 2015 profit. If Defendants were in fact reviewing costs every quarter and taking provisions when they should have, then the $1 billion write-down would have been incremental over the course of several years and would ***not*** have occurred in one fell swoop.

274. The timing of the March 28, 2017 write-down is also revealing. Only 25-days earlier, Ericsson issued its 2016 Swedish annual report (on March 3, 2017), confirming that it had adequate internal controls and complied with the applicable accounting standards. And yet a single quarter after disclosing the need for the March 2017 write-down, Ericsson revealed it would need to take additional provisions of SEK 3-5 billion ($386-$643 million in U.S. dollars), and that 42 of Ericsson's Managed Services contracts were loss-making and required renegotiation or exit.

**D. The SvD Article and Response Demonstrate Defendants' Scienter**

275. Even if Defendants were somehow previously unaware of the pervasive revenue recognition practices occurring at the Company for some time (a conclusion belied by the allegations herein), the SvD Article—published on July 17, 2016, and based on the accounts of a then-current employee and a former employee—exposed those practices to them. Indeed, Ericsson responded to the article the next day, purporting to deny the reported accounting improprieties—a response that Defendants Frykhammar and Vestberg personally directed, as their statements evidence.

**E. The Misstatements Relate to Ericsson's Core Operations and Further Demonstrate Defendants' Scienter**

276. In its 2014-2016 Annual Reports, Ericsson indicated that it "derives most of its sales from large, multi-year agreements." The fraud described herein relates entirely to Ericsson's long-term contracts—a core business operation to which all of the misstatements alleged relate. That the scheme involved a central component of Ericsson's business further

supports a strong inference that Defendants had knowledge—or were at least reckless in not knowing—of the illicit practices at the heart of the fraud.

### F. The SOX Certifications Support a Finding of Scienter

277. By signing SOX certifications in which they represented that they had designed effective disclosure controls and procedures, the Individual Defendants acknowledged their responsibility to ensure that material information was known to management and appropriately incorporated into the Company's SEC filings and other corporate communications directed to investors. Knowledge of the improper accounting and other practices described herein is thus imputed to the Individual Defendants and management. Nevertheless, at the very least, signing the SOX certifications—which themselves were false and materially misleading—evidences the Individual Defendants' recklessness.

## VIII. LOSS CAUSATION

278. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ericsson's ADS and operated as a fraud or deceit on Class Period purchasers of Ericsson's ADS by failing to disclose and misrepresenting the adverse facts detailed herein. Later, when Defendants' prior misrepresentations and fraudulent course of conduct were revealed to the market, the price of Ericsson's ADS declined significantly as the prior artificial inflation was released from the Company's ADS price.

279. As a result of their purchases of Ericsson's ADS during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Ericsson's ADS to trade at artificially inflated levels throughout the Class Period, closing at $11.99 per share on April 24, 2013 (the first day of the Class Period), closing at a

high of $14.19 per share on September 18, 2013, and then falling to $6.07 per share at closing on July 18, 2017.

280. By concealing from investors, the adverse facts detailed herein, Defendants presented a misleading picture of Ericsson's business and prospects. As Defendants began to reveal these adverse facts to the market, the price of Ericsson's ADS fell dramatically. On the day of the partial revelation of the truth, March 28, 2017, Ericsson's ADS fell from a closing price of $6.69 on the prior day to $6.45—a 3.59% drop. On the date of the second revelatory disclosure, July 18, 2017, Ericsson's ADS fell from a closing price of $7.28 on the prior day to $6.07—a 16.62% drop. This decline removed the artificial inflation from the price of Ericsson's ADS, causing economic loss to investors who had purchased Ericsson's ADS during the Class Period.

281. The decline in the price of Ericsson's ADS following these revelations was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Ericsson's ADS and analyst reactions to the news, individually and collectively, negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

282. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of Ericsson's ADS and the subsequent material decline in the value of Ericsson's ADS when Defendants' prior misrepresentations, misleading half-truths and other fraudulent conduct were revealed.

## IX. APPLICATION OF THE PRESUMPTION OF RELIANCE

283. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated upon omissions of material fact which there was a duty to disclose.

284. In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because:

(a) Ericsson's ADS were actively traded on the NASDAQ, an informationally efficient market, throughout the Class Period;

(b) Ericsson's ADS traded at high weekly volumes during the Class Period;

(c) as a regulated issuer, Ericsson filed periodic public reports with the SEC;

(d) Ericsson regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Ericsson;

(f) Ericsson's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote analyst reports on Ericsson during the Class Period include, but are not limited to, the following: Goldman Sachs, JPMorgan, Arete Research, Charter Equity Research, Morgan Stanley, UBS, BofA Merrill Lynch, Raymond

James, Credit Suisse AG, Societe Generale Cross Asset Research, Citigroup Inc., Barclays PLC, Handelsbanken Capital Markets AB, Agency Partners LLP, Danske Bank Markets Equity Research, SEB, Exane BNP Paribas, and Natixis;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Ericsson's ADS; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of Ericsson's ADS between the time Defendants misrepresented or failed to disclose material facts and the time the true facts began to be revealed.

## X. NO SAFE HARBOR

285. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

286. ***First***, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor. Defendants' false and misleading statements and omissions alleged herein are not forward-looking because such statements: (1) relate to historical or current fact; (2) implicate existing conditions; (3) do not contain projections of future performance or future objective; and (4) to the extent that some aspect of the statement does contain projections of future performance or objective. To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

287. ***Second***, any purported forward-looking statements were not accompanied by meaningful cautionary language because any risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. Additionally, to the extent Defendants included any cautionary language, such language was not meaningful because any potential risks identified by Defendants had already manifested. To the extent Defendants included any cautionary language, it was not precise and did not relate directly to any forward-looking statements at issue. Defendants' cautionary language was boilerplate and did not change during the Class Period, despite the fact that conditions had materially changed.

288. ***Third***, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements were made, the speaker knew the statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

289. Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that, during the proposed Class Period of April 24, 2013 through July 17, 2017, inclusive, purchased or otherwise acquired the publicly traded ADS of Ericsson, and were damaged thereby, except as excluded. Excluded from the Class are: (1) Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) any subsidiary or affiliate of Ericsson; (4) the directors and officers of Ericsson during the Class Period, as well as the members of their immediate families; and (5) the legal representatives, heirs, successors, and assigns of any such excluded party.

290. The members of the Class are so numerous that joinder of all members is impracticable. In the United States, each Ericsson ADS represents one underlying Class B

share and the ADS are traded on the NASDAQ. According to Ericsson's 2016 Annual Report, there were more than 326 million ADS outstanding as of December 31, 2016 and over 3,800 registered holders of such ADS, with a significant number of ADS held by banks, brokers and/or nominees for the accounts of their customers. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class numbers is in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Ericsson or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

291. Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

292. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have has retained counsel competent and experienced in class and securities litigation.

293. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether and to what extent the market price of Ericsson's ADS was artificially inflated during the Class Period because of the material misstatements alleged herein;

(f) whether the Individual Defendants were controlling persons of Ericsson;

(g) whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); and

(h) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

294. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

295. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

296. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

297. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Ericsson's ADS; and (iii) cause Plaintiffs and members of the Class to purchase Ericsson's ADS at artificially inflated prices.

298. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

299. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Ericsson's ADS during the Class Period.

300. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Ericsson's ADS, Plaintiffs and other members of the Class purchased Ericsson's ADS at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Ericsson's ADS at such artificially inflated prices.

301. As set forth herein, when Defendants began to reveal adverse, previously undisclosed facts concerning the Company, the price of Ericsson's ADS declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Ericsson's ADS at artificially inflated prices and the subsequent decline in the price of that ADS when Defendants began to reveal such facts.

302. By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

303. Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein.

304. This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

305. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Ericsson's ADS and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period. Thus, Ericsson is primarily liable under Section 10(b) of the Exchange Act.

306. As set forth above, the Individual Defendants were controlling persons of Ericsson during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, as well as their ability to exercise and/or actual exercise of influence and control over the Company's dissemination of information.

307. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Ericsson, including the content of its public statements with respect to the performance of Ericsson's contracts, its financial statements, its internal controls, and accounting practices with respect to costs and recognition of revenue.

308. The Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased Ericsson's ADS during the Class Period.

309. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Ericsson's ADS, Plaintiffs and other members of the Class purchased Ericsson's ADS at an artificially inflated price during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Ericsson's ADS at artificially inflated prices.

310. As set forth herein, when Defendants subsequently began to reveal adverse, previously undisclosed facts concerning the Company, the price of Ericsson's ADS declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Ericsson's ADS at artificially inflated prices and the subsequent decline in the price of that ADS when such facts began to be revealed.

311. By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of Ericsson in violation of Section 20(a) of the Exchange Act.

## XII. PRAYER FOR RELIEF

312. WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully pray for judgment against Defendants as follows:

(a) Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class representatives, and appointing Robbins Geller Rudman & Dowd LLP as Class counsel pursuant to Rule 23(g);

(b) Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial together with prejudgment interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(d) Granting such other and further relief as the Court deems just and proper.

## XIII. JURY DEMAND

313. Plaintiffs demands a trial by jury of all issues so triable.

DATED: October 22, 2018

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
JOSEPH RUSSELLO
WILLIAM J. GEDDISH

/s/ *Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
wgeddish@rgrdlaw.com

*Lead Counsel for Plaintiffs*

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
CAROL C. VILLEGAS
JAKE BISSELL-LINSK
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
ckeller@labaton.com
cvillegas@labaton.com
jbissell-linsk@labaton.com

*Additional Counsel for Plaintiffs*

CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on October 22, 2018, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Samuel H. Rudman*

**SAMUEL H. RUDMAN**