UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                             :

OKLAHOMA LAW ENFORCEMENT RETIREMENT  :
SYSTEM et al.,                                  :

                    Plaintiffs,     :           18-CV-3021 (JMF)

                               :      <u>OPINION AND ORDER</u>

        -v-                     :

TELEFONAKTIEBOLAGET LM ERICSSON et al.,  :

                               :

                    Defendants.    :

                               :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Defendant Telefonaktiebolaget LM Ericsson ("Ericsson") is a Swedish company that

provides hardware and services for telecommunications networks.  In this putative securities

fraud class action, investors allege that Ericsson and several of its senior executive officers and

directors made false and misleading statements and omissions about the company's financial

performance, accounting practices, internal controls, and policies related to certain long-term

service contracts.  Defendants now move, pursuant to Rules 9(b), 12(b)(2), and 12(b)(6) of the

Federal Rules of Civil Procedure, to dismiss the Second Amended Complaint.  For the reasons

that follow, Defendants' motion pursuant to Rules 9(b) and 12(b)(6) is GRANTED.

## BACKGROUND

      The following facts are taken from the Second Amended Complaint (the "Complaint"),

documents it incorporates by reference, and matters of which the Court may take judicial notice,

including public disclosure documents that Ericsson was required to file by law.  *See, e.g.*, *Silsby*

*v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014).

Ericsson is a public company, incorporated and headquartered in Sweden and traded on the NASDAQ, that "provides networking hardware and services to telecommunications companies, like cellular phone providers, around the world." ECF No. 52 ("SAC"), ¶ 2. At least two-thirds of its business "involves providing services to customers through large, multi-year contracts." *Id.* Ericsson's services include "designing, building, and operating" communications networks, collectively referred to as "Managed Services." *Id.* ¶ 4. During the Class Period — from April 24, 2013, to July 17, 2017 — Ericsson maintained more than three hundred Managed Services contracts, accounting for roughly 12% of its net sales in 2017. *Id.* ¶¶ 1, 4.

In connection with its long-term service contracts, Ericsson allegedly engaged in four business and accounting practices relevant here. First, Ericsson entered into long-term "loss-leading contracts" — contracts that "Ericsson entered into with the understanding that they were going to lose money," but undertook anyway "to gain market share." *Id.* ¶ 137. A former employee who served as the Chief Operating Officer of Managed Services during the Class Period knew of at least twenty-four such long-term service contracts. *Id.* ¶ 8. Loss-leading contracts were encouraged by an internal policy begun in 2016 known as "Feed the Gorilla," which "prioritized signing contracts at any cost above prudent risk management and scoping," without "worry[ing] about" whether project costs ultimately exceeded revenues. *Id.* ¶¶ 17-18, 129, 269. Loss-leading contracts were also incentivized through commissions paid upfront to sales employees. *Id.* ¶ 118.

Second, Ericsson underestimated — or "under-scoped" — the costs of long-term service contracts in order to win project bids. *Id.* ¶¶ 9-11. Ericsson did this by accepting "open-ended commitment[s]" to fulfill any service needs that arose and failing to accurately estimate such costs. *Id.* ¶ 9. For example, in 2012, Ericsson estimated that its costs for a project at Grand

Central Terminal would be $5-6 million, when in fact the costs grew to $157 million by March 2018. *Id.* ¶ 11. Ericsson's initial estimate failed to account for service needs such as "install[ing] different antennas, and finally an entire 'new line.'" *Id.* ¶ 115. Ericsson was forced to shoulder the additional costs without compensation. *Id.* Ericsson allegedly encouraged its employees to scope contracts "as 'slim and lean' as possible" through a "corporation-wide initiative" called "Bare Bone Tender Scoping." *Id.* ¶ 151. The program continued "at least into 2014." *Id.*

Third, the Complaint alleges that Ericsson delayed recognizing costs that it incurred by "pushing" them onto the accounting books for later financial quarters. *Id.* ¶ 13. Account Vice Presidents advocated for this practice, and it was common, for example, in service contracts with Verizon and AT&T. *Id.* ¶ 114. One former project manager at Ericsson explained that "Ericsson would bill AT&T for projects in advance but wait until the project was completed before recognizing the costs." *Id.* ¶ 123. According to another former employee, the practice was known to "top management," including Ericsson's U.S. Chief Executive Officer and Chief Financial Officer (neither of whom is named as a Defendant here). *Id.* ¶ 114. Publicly, however, Ericsson represented that "losses" were accounted for as they arose. *Id.* ¶¶ 6, 97-98, 123.[1]

Fourth, Plaintiffs assert that Ericsson prematurely recognized revenues in its accounting. For example, pursuant to a service contract with AT&T, Ericsson was required to reach certain completion milestones, but Ericsson "would get AT&T to sign off on a milestone — prior to actually reaching the milestone — in order to internally record the revenue." *Id.* ¶ 155. A former project finance manager also reported that Ericsson would recognize revenue before

---

[1] Plaintiffs appear to treat "losses" as synonymous with "costs." That is questionable, but for present purposes the Court will assume that "losses" and "costs" are the same.

Ericsson had sent an invoice to other customer. *Id.* ¶ 154. Publicly, however, Ericsson represented that revenues were recognized "when the services have been provided, generally pro rata over the contract period." *Id.* ¶ 104.

Plaintiffs allege that, without disclosing these four practices, Ericsson regularly reported its financial results. *Id.* ¶¶ 186-87. Ericsson also made a variety of affirmative statements related to its contracts, accounting practices, and internal controls. For example, in its 2014 Annual Report, Ericsson represented that about 75% of its managed services contracts were in the "optimization phase," which had a "beneficial effect on earnings and cash flow." *Id.* ¶ 215(d). As noted, Ericsson also repeatedly asserted that losses were accounted for when they became "probable" and that revenue was "recognized when services have been provided, generally pro rata over the contract period." *E.g.*, *id.* ¶¶ 95, 104.[2]

On July 17, 2016, a Swedish newspaper called *Svenska Dagbladet* published an article reporting that Ericsson was using "aggressive accounting techniques," including prematurely recognizing revenue to the point that "revenue from existing contracts had been so fully recognized that these contracts are now virtually empty — *i.e.*, that most of the long-term contracts had already been accounted for as sales." *Id.* ¶ 156. Ericsson published an official denial of the article's allegations on July 18, 2016. *Id.* ¶ 21. Ericsson's Chief Financial Officer at the time, Defendant Jan Frykhammar, also denied the allegations during a conference call with investors on July 19, 2016. *Id.* ¶ 160. Nevertheless, Ericsson's stock price dropped from $7.77 on July 18, 2016, to $7.08 on July 19, 2016. *Id.* ¶ 159.

On March 28, 2017, Ericsson announced that a "provision," or write-down of asset value, of between seven and nine billion Swedish krona (corresponding to between $900 million and

---

[2]     The specific statements at issue are detailed in the discussion below.

$1.16 billion) was expected in its first quarter financial report. *Id.* ¶ 23. During a conference call on that date, Defendants Börje Ekholm (then Ericsson's President and Chief Executive Officer) and Carl Mellander (then Ericsson's Chief Financial Officer) explained to investors that a "few," "specific and certain" large contracts had encountered "negative developments, which could be lower [sic] expected revenues or higher costs to complete those projects . . . due to specific events during the first quarter." *Id.* ¶¶ 23, 162-64. Ekholm insisted that the issues were "isolated." *Id.* ¶ 163. Still, the Complaint alleges that "the market began to understand that these provisions were necessitated by Ericsson taking on unprofitable contracts and then letting those unprofitable contracts pile up on its books." *Id.* ¶ 165. By the close of business on March 28, 2017, Ericsson's share price fell from $6.69 to $6.45. *Id.* ¶ 161.

On April 25, 2017, Ericsson released its quarterly results for the first quarter of 2017, including a provision of 8.4 billion Swedish krona (about $1.08 billion). *Id.* ¶ 166. Ericsson explained that the provision was the result in part of "additional project costs . . . which due to recent negative developments are not expected to be covered by future project revenues." *Id.* During conference calls that day, Ekholm further stated that "we have contracts today that are not profitable," and Mellander admitted that "some of those projects . . . could have been scoped in a better way." *Id.* ¶¶ 167, 171. Finally, to the extent relevant here, on July 18, 2017, Ericsson released its results for the second quarter of 2017, and reported "continued declining sales and increasing losses." *Id.* ¶ 174. Specifically, Ericsson disclosed that forty-two contracts accounting for $892 million in revenue in 2016 would have to be "exit[ed], renegotiate[d], or transform[ed]." *Id.* Ekholm again admitted during conference calls that "part of it is, of course, we could have scoped the contract better." *Id.* ¶ 178(b). In addition, Ericsson warned that there was an "increased risk of further market and customer project adjustments, which would have a

negative impact on results, estimated" at three to five billion Swedish krona. *Id.* ¶ 175.

Ericsson's share price fell that day from $7.28 to $6.07. *Id.* ¶ 176.

On April 5, 2018, Plaintiffs filed this lawsuit, alleging that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

## LEGAL STANDARDS

In reviewing a motion to dismiss, the Court accepts all well-pleaded factual allegations in the Complaint as true and draws all reasonable inferences in favor of the nonmoving party. *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) — that is, a claim that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Because they allege securities fraud, Plaintiffs here must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc.*

*v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## DISCUSSION

Plaintiffs seek to hold all Defendants liable for securities fraud under Section 10(b) and Rule 10b-5 and to hold the individual Defendants liable as "control persons" under Section 20(a). To state a claim for relief under Section 10(b) and Rule 10b-5 (and by extension, a claim under Section 20(a)), a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 35-36 (2011) (internal quotation marks omitted); *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (noting that a plaintiff must plead a plausible primary violation of Section 10(b) to state a claim for control person liability under Section 20(a)).

For a variety of reasons, Plaintiffs' claims fail to satisfy these requirements. The Court will first address Plaintiffs' main allegations — those concerning Ericsson's financial reporting and stated accounting practices — and then turn to Plaintiffs' remaining allegations.

**A. Claims Related to Ericsson's Financial Reporting and Accounting Practices**

Plaintiffs allege that Ericsson's reported "financial metrics — including sales, margins, income, and revenue" — were materially false and misleading because they reflected data that was "tainted by" (1) Ericsson's contracting practices (i.e., entering into loss-leading contracts and under-scoping contracts), and (2) Ericsson's accounting practices (i.e., prematurely recognizing revenues and delaying recognition of costs). SAC ¶¶ 186-87.[3] In addition, Plaintiffs allege that Defendants asserted that they accounted for costs and revenues in ways that conflicted with their actual accounting practices. *E.g.*, *Id.* ¶¶ 196-98.[4] The Court will begin with Plaintiffs' claims related to loss-leading and under-scoped contracts.

**1. Claims Related to Loss-Leading and Under-Scoped Contracts**

Plaintiffs' claims premised on Ericsson's contracting practices fail as a matter of law for several reasons. First, Plaintiffs do not adequately allege falsity. In particular, the Complaint fails to make clear what "data" was tainted by "Ericsson's failure to accurately report loss-making contracts . . . [and] the [projected] costs associated with its contracts." SAC ¶ 186. The types of reported financial data described in the Complaint — for example, "sales, margins, income, and revenue," *id.* ¶ 186 — did not reflect Ericsson's expectations for future revenues, costs, and profits. Instead, they described costs, revenues, and other financial results for past

---

[3]     *See also, e.g., id.* ¶¶ 184 & n.11, 203, 212, 236. Relatedly, Plaintiffs allege that Defendants falsely certified that their financial reports were accurate and gave "a fair view of the performance of the business." *Id.* ¶¶ 203(b), 219, 242, 244.

[4]     *See also id.* ¶ 199 ("[P]rovisions for any estimated losses are made immediately when losses are probable." (2013 Annual Report)); *id.* ¶ 209 (same (2014 Annual Report)); *id.* ¶ 218 (same (2015 Annual Report)); *id.* ¶ 242 (same (2016 Annual Report)); *id.* ¶ 200 ("Revenue is recognized when the services have been provided, generally pro rata over the contract period." (2013 Annual Report)); *id.* ¶ 209 (same (2014 Annual Report)); *id.* ¶ 218 (same (2015 Annual Report)); *id.* ¶ 242 (same (2016 Annual Report)); *id.* ¶ 224 ("The claim that Ericsson in a wrongful way has reported income in its accounting is not correct." (July 18, 2016 press release)); *id.*  ¶ 231 (same (Frykhammar)).

periods, *see, e.g.*, *id.* ¶ 185; ECF No. 55-6, at 21-27. Plaintiffs do not sufficiently allege how these retrospective reports would be "tainted" by inaccurate future projections.

Second, even if Plaintiffs did allege falsity, they fail to adequately allege scienter. Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference" of either an "intent to deceive, manipulate, or defraud," or recklessness. *Emps.' Ret. Sys. of Gov. of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* (internal quotation marks omitted). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

Plaintiffs' allegations fall short because they fail to show information or knowledge that alerted Defendants that their initial estimates were wrong "from the start." *See* SAC ¶ 115. For example, in Plaintiffs' key example of an under-scoped contract, the Grand Central Terminal project, Plaintiffs allege only that the project later turned out to be millions of dollars more costly than initially expected, and assert that "Ericsson was not concerned with these costs." *Id.* ¶ 11. But the Complaint fails to describe what information Defendants had at the outset that contradicted their estimates and, thus, to what extent they understated the proper cost projections. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1229 (2d Cir. 1994) ("These allegations do not say, however, that the company's disclosures were inconsistent with current data."). In fact, one of the former employees that Plaintiffs quote stated that Ericsson would not have known

about cost overruns until "six to twelve months *after* starting a project." SAC ¶ 277 (emphasis added); *see also id.* ¶¶ 144-45 (noting that "corporate headquarters" learned of the "profit and loss performance of service contracts" through quarterly "report cards," and later sent employees to ascertain "why a long-term service contract was not performing well").

What Plaintiffs really allege, therefore, is a theory of "fraud by hindsight," which is not actionable. *See Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 75 (2d Cir. 2008) (summary order); *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."). For example, Plaintiffs state that "the Company *should have* known the true cost from the start of the project." SAC ¶ 115 (emphasis added); *see also id.* ¶ 127 (alleging that scoping was "overly optimistic"); *id.* ¶ 147 (alleging that Ericsson took on projects "with the hope that doing so would result in the sale of equipment or other business outside the scope of the original agreement, but . . . these additional sales often did not materialize"); *id.* ¶ 150 (alleging that "sometimes Ericsson most likely would have known it was underestimating costs before the contract was signed, sometimes it would know soon after the contract was signed, and sometimes they learned later in the project"). But such allegations do not suffice under the PSLRA. *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 482 (S.D.N.Y. 2017) ("At most, the Second Amended Complaint alleges that Defendants may have been negligent in failing to disclose contrary information as to its predictions about the Brucejack Project. This, however, does not amount to recklessness.").

Plaintiffs place great emphasis on their allegations about two internal policies known as Bare Bone Tender Scoping and Feed the Gorilla, but these allegations also do not support an inference of scienter. For one thing, they suffer from the same fundamental defect as the

allegations about the contracting practices themselves did: They fail to specifically describe what exactly Ericsson knew, at the time it entered into any contract, that contradicted the initial estimates or what Defendants publicly stated. Moreover, the Complaint fails to allege that either of the policies was directed by the individual Defendants. *See* SAC ¶ 112 (alleging that Feed the Gorilla was "approved by the Head of North America at the time"); *id.* ¶ 132 (alleging that one former employee "believed that [the program] originated from Ericsson's headquarters in Sweden"); *id.* ¶ 151 (alleging that "senior executives would have known about BBTS" and Defendant Mandersson "should have been aware of the program"). Plaintiffs also argue that, regardless of the scienter of the individual Defendants, the Complaint contains sufficient allegations to support a finding of corporate scienter. *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("It is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." (internal quotation marks and alterations omitted)). But even as to Ericsson itself, Plaintiffs must still "specifically identify the reports or statements containing" information that contradicted the company's public statements. *Id.* at 196 (quoting *Novak*, 216 F.3d at 309). Plaintiffs fail to do so.

In short, Plaintiffs fail to adequately allege that any of Defendants' alleged statements about its financial results or accounting practices were false in light of the alleged practices of entering into loss-leading and under-scoped contracts. In addition, Plaintiffs fail to allege that such statements, even if false, were made with the requisite scienter. Accordingly, these claims must be and are dismissed.

### 2. Claims Related to Revenue and Cost Recognition

Plaintiffs' claims with respect to Ericsson's accounting practices must be dismissed as

well.  Allegations of "accounting irregularities" are insufficient to state a securities fraud claim

unless they are "coupled with evidence of corresponding fraudulent intent."  *Novak*, 216 F.3d at

309 (internal quotation marks omitted).  Here, it is not even clear from Plaintiffs' allegations that

Ericsson's accounting deviated from its publicly stated practices.  For example, Ericsson

disclosed that "[r]evenue is recognized when the services have been provided, *generally* pro rata

over the contract period" and stated that "provisions for any estimated losses are made

immediately when losses are probable."  SAC ¶ 200 (emphasis added), ¶ 209.  Both of these

standards, however, inherently involve the exercise of judgment, especially in light of

"exceptions" and factors that Plaintiffs acknowledge complicate the determination of when to

recognize costs and revenues.  *See id.* ¶¶ 6, 101-02.  Plaintiffs never allege why the accounting of

costs or revenues for any specific project contravened established standards.  For example,

Plaintiffs assert that Ericsson "pushed" costs for projects with Verizon into future quarters, but

fail to allege when the costs "became probable" and why.  *See id.* ¶ 13.  Similarly, Plaintiffs

allege that during an AT&T project, Ericsson treated a contractual milestone as reached "when

the task was not yet completed," but fail to address any of the factors set out by the rules that

allegedly govern revenue recognition.  *See id.* ¶¶ 14, 102.  Moreover, Plaintiffs allege that

revenue was prematurely recognized based on the percentage of work completed because the

scope of certain projects was underestimated.  *E.g.*, *id.* ¶ 16.  But as already discussed, Plaintiffs

fail to describe with particularity how and why Ericsson's estimates were wrong from the start.

At bottom, Plaintiffs rely on a "bald assertion of falsity," which is inadequate.  *See In re QLT*

*Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 535-36 (S.D.N.Y. 2004).

        In addition, Plaintiffs fail to allege "evidence of corresponding fraudulent intent."  *Novak*,

216 F.3d at 309 (internal quotation marks omitted).  Plaintiffs' allegations, including the

observations of the former employees cited in the Complaint, do not reflect any knowledge by the individual Defendants of these accounting practices, let alone "identify with specificity the documents or way in which . . . contrary information was communicated to Defendants." *In re Pretium*, 256 F. Supp. 3d at 481. For example, Plaintiffs allege that "Account Vice Presidents" were observed "advocating to defer costs during meetings," but Plaintiffs never allege whether those discussions actually led to cost deferral and, if so, who made the decision to defer costs or whether any of the relevant information was known to Defendants. SAC ¶ 114. Even the one former employee's conclusory assertion that the practice of pushing costs "was known to the top management in the U.S." extends only to "the U.S. CEO and CFO," not to the individual Defendants. *Id.* Thus, these allegations are insufficient to create a strong inference of scienter.

Plaintiffs argue that an inference of scienter is supported by the fact that the costs and revenues at issue relate "entirely to . . . a core business operation." SAC ¶ 281. As this Court has observed, however, "there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid." *Hensley v. IEC Electronics Corp.*, No. 13-CV-4507 (JMF), 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014). Moreover, even if the rule survives in full force, it would not apply here, as the operation in question must "constitute nearly all of a company's business" before a court may infer scienter. *Id.* at *5. Managed Services accounted for only 12% of Ericsson's net sales in 2017. SAC ¶ 4. More broadly, Plaintiffs allege that "[a]t least two-thirds of its business *involves* providing services to customers through large, multi-year contracts." *Id.* ¶ 2 (emphasis added). The percentage of business *constituting* the provision of long-term services, however, must be less given that Ericsson also provides hardware and short-term services. Accordingly, the core operations doctrine alone would not save Plaintiffs' claims.

In arguing that scienter is adequately alleged, Plaintiffs also point to the magnitude of the 2017 provision. ECF No. 57, at 28. To be sure, the write-down was significant, and that is certainly relevant to scienter — especially as to statements made after Defendants became aware that the write-down was necessary. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). But "while certainly a relevant factor, it is well established that the size of the fraud alone does not create an inference of scienter." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 (S.D.N.Y. 2011) (internal quotation marks and alterations omitted). Considered in light of Plaintiffs' allegations as a whole, the magnitude of the provision is not sufficient to support scienter.

Thus, Plaintiffs fail to adequately allege that any of Defendants' alleged statements about its financial results or accounting practices were false because of the alleged practices of prematurely recognizing revenues and delaying recognition of costs. In addition, Plaintiffs fail to allege that such statements, even if false, were made with scienter. Accordingly, these claims must be and are dismissed as well.

## B. Other Statements and Omissions

Plaintiffs' remaining claims also fail as a matter of law, for various reasons. First, Plaintiffs allege a series of misrepresentations that are not actionable because they are "expressions of puffery and corporate optimism." *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *3 (S.D.N.Y. Jan. 18, 2018) (internal quotation marks omitted). These include the 2013 Annual Report's statement that "[a] clear focus on operating margins demonstrates our commitment to profitable growth." SAC ¶ 192.[5] It is well established

---

[5]     *See also* SAC ¶ 206 ("[W]e are a company that are a [sic] very prudent in terms of accounting, so the concept of pull-ins I don't really understand." (Frykhammar, 4Q2014 earnings call)); *id.* ¶ 212 ("There is continued good progress in returning the Network Rollout business to profitability and its operating margin." (Vestberg, 1Q2015 Report) (other statements included)); *id.* ¶ 238 ("In the near term, this means we prioritize profitability over growth." (2016 Swedish

that such general statements about "reputation, integrity, and compliance with ethical norms," as well as corporate "excellence" and progress, are nonactionable puffery. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014); *see also City of Warwick Municipal Emps. Pension Fund v. Rackspace Hosting, Inc.*, No. 17-CV-3501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016). Put differently, the statements identified by Plaintiffs "are too general to cause a reasonable investor to rely upon them." *ECA and Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). Additionally, Plaintiffs fail to "demonstrate with specificity" that the statements either imply certainty or were not genuinely or reasonably believed at the time they were made. *See, e.g.*, *City of Austin Police Retirement Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013).

Second, Plaintiffs allege a series of misrepresentations that fall under the PSLRA's safe harbor for forward-looking statements and the judicial "bespeaks caution" doctrine. These include the 2014 Annual Report's statement that, "[g]oing into 2015, we aim to continue to grow faster than the market combined with best-in-class margins and strong operating cash flow." SAC ¶ 207.[6] The PSLRA defines a "forward-looking statement" to include "a statement of the plans and objectives of management for future operations" and "a statement of future economic

---

Annual Report)).

[6] *See also* SAC ¶ 207 (other similar statements); *id.* ¶ 188 (Ericsson would "of course, continue with our cost and efficiency work." (Vestberg, 1Q2013 earnings call)); *id.* ¶ 192 ("We will continue to reduce costs and improve efficiency." (Vestberg, 2013 Annual Report)); *id.* ¶ 223 (Ericsson "remains fully committed to drive cost reduction and efficiencies, including delivering on its SEK 9 b. net savings program during 2017." (April 21, 2016 press release)); *id.* ¶ 240 ("Ericsson focuses on optimization and industrialization by simplifying, implementing and consolidating." (2016 Swedish Annual Report) (including related statements)); *id.* ¶ 257 ("[C]ontracts have been, and may in the future be, terminated or reduced in scope." (Annual Reports during Class Period)).

performance." 15 U.S.C. § 78u-5(i)(1)(B), (C). A forward-looking statement is not actionable if it is "identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Similarly, under the "bespeaks caution" doctrine, forward-looking statements are protected if they are "accompanied by adequate cautionary language." *In re QLT*, 312 F. Supp. 2d at 532. Here, Ericsson accompanied its forward-looking statements with meaningful cautionary language. For example, Ericsson warned of "significant contractual risks" in its Managed Services business, including the risk of unexpected costs "associated with fixing software or hardware defects, high service and warranty expenses," and other issues. *See* ECF No. 55-3, at 11. Defendants also warned of the risk of variations in long-term service contracts' "gross margin" and cost pressures from customers. *See id.* at 8-12; *see also* ECF 55-4 at 9 ("[T]here can be no assurance that our actions to reduce costs will be sufficient or quick enough to maintain our gross margin in [long-term] contracts."). These warnings were "not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772. Moreover, even aside from the cautionary language, the alleged statements are entitled to the protection of the safe harbor because Plaintiffs do not satisfy the "actual knowledge" standard, which is even "stricter than [the standard] for statements of current fact." *Id.* at 773 (internal quotation marks omitted).

Third, Plaintiffs allege a misrepresentation that is not actionable because it qualifies as an opinion — namely, the 2013 Annual Report's statement that "[w]e have a good balance of [Managed Services] contracts in the transition, transformation and optimization phases." SAC ¶ 194. "[S]ubjective statements of opinion are generally not actionable as fraud." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015). In particular, statements of opinion

are actionable only "if they (1) were not honestly believed when made; (2) were supported by untrue facts; or (3) omit to mention facts that conflict with what a reasonable investor would take away from the statements themselves." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589 (S.D.N.Y. 2016). Plaintiffs' allegations fail to satisfy any of these standards. *See Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, at *8-9 (S.D.N.Y. Oct. 5, 2016) (dismissing claims based on stated opinions about recall reserves because even if the opinions turned out to be wrong, "misguided optimism is not a cause of action, and does not support an inference of fraud" (quoting *Shields*, 25 F.3d at 1129)).

Next, Plaintiffs identify a series of misrepresentations for which they do not adequately allege falsity. These include the 2015 Swedish Annual Report's assertion that 75% of Ericsson's managed services contracts were in the "optimization" phase and had a "beneficial effect on earnings and cash flow." SAC ¶ 215(d).[7] Plaintiffs allege that Ericsson held a "large number of loss-making contracts," *see id.* ¶ 216, but they do not show that this contradicted the company's

---

[7]     *See also* SAC ¶ 190 ("[W]e update the plan cost estimate on a monthly basis across all projects. And we track variations between actual and plan costs so I would view those additional finalization cost surprises as a quite smaller risk. . . . There is a very detailed review of all of the costs involved in the projects, both actuals as well as planned costs and we adjust the cost levels that we recognized in the P&L all the time." (2Q2013 earnings call, Vestberg)); *id.* ¶ 194 ("[T]he vast majority of the business [is] in the optimization phase — which has a beneficial effect on revenue and cash flow." (2013 Annual Report)); *id.* ¶ 215(b) ("Our global cost and efficiency program is progressing according to plan and operating expenses for the second half of 2015 declined by almost 10%." (2015 Swedish Annual Report)); *id.* ¶ 229 ("Actions have been implemented to restore Global Services profitability . . . . Losses in Network Rollout have been significantly reduced and the operating margin, excluding restructuring charges, for Professional Services has gradually improved to 10% in the quarter." (2Q2016 Report, Vestberg)); *id.* ¶ 234 ("The positive effect of the cost and efficiency program did not offset the sharp decline in gross income." (3Q2016 Report, Frykhammar)); *id.* ¶ 189(b) ("The momentum for Professional Services continued with stable earnings." (3Q2013 Report, Vestburg; *id.* ¶ 203(c) ("Profitability showed stable improvement across all segments. This was primarily driven by favorable business mix." (3Q2014 Report, Vestberg)); *id.* ¶ 221 ("The underlying margin continues to be good," and the "weak" operating margin for professional services is due to "what I would call growing pains." (1Q2016 Report, Vestberg)).

estimate of its portfolio mix or the categorization of any particular contract. *Cf. Jones v. Party City Holdco, Inc.*, 230 F. Supp. 3d 185, 191 (S.D.N.Y. 2017) (rejecting claims based on statements about the importance of *Frozen* to Party City's "aggregate business" because "the [Complaint] contains no allegations about the total amount of *Frozen*-licensed sales in 2014 or the percentage those sales represented of Party City's aggregate business"). Similarly, Plaintiffs attack a series of responses by Ekholm and Mellander to questions about Ericsson's 2017 provision, but they fail to show that these assessments were false in light of the information available to the officials at the time. *See* SAC ¶¶ 253-54 (stating that "based on our assessment of the current situation," "what we have visibility on now is what we have taken action on in the quarter," but warning that "you don't know if this is — it has an inherent risk to it"); *id.* ¶¶ 246-48, 252 (describing the problem as "isolated" to a "limited number of projects"). Instead, Plaintiffs make conclusory allegations of falsity, which do not suffice.

Plaintiffs also target Defendants' Sarbanes-Oxley Act ("SOX") certifications, *see, e.g.*, SAC ¶ 219, but these claims must be dismissed because Plaintiffs fail to allege any particularized facts "pertaining to the Company's internal structure for financial controls," *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 358 (S.D.N.Y. 2015) (internal quotation marks omitted). Instead, in conclusory fashion, Plaintiffs assert that the controls must have been inadequate in light of the alleged accounting and reporting errors. Such allegations are inadequate. *See id.* at 358-59; *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10-CV-2835 (NRB), 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011); *see also* ECF No. 55-1 (auditor concluding that Ericsson maintained "in all material respects, effective internal control over financial reporting"). Moreover, as Defendants point out, the SOX certifications make only the limited representations that the signers did not have "knowledge" at the time of

false or inaccurate financial reporting and that the internal controls were "designed" to be adequate. *See* ECF No. 54, at 22; SAC ¶ 95. Plaintiffs do not allege sufficient facts to show that these statements were false.

Finally, Plaintiffs allege claims based on Defendants' failure to disclose its four business practices, as well as the Feed the Gorilla and Bare Bone Tender Scoping policies. *See* SAC ¶¶ 260-265. Federal securities laws, however, do not generally require companies to disclose internal policies or violations thereof. *See, e.g.*, *In re UBS AG Sec. Litig.*, No. 07-CV-11225 (RJS), 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012). Instead, disclosure is required only when there is a duty to disclose, as when an affirmative corporate statement would "otherwise [be] inaccurate, incomplete or misleading" or when "a statute or regulation requir[es] disclosure." *Finocchiario v. NQ Mobile, Inc.*, No. 15-CV-6385 (NRB), 2018 WL 1217728, at *7 (S.D.N.Y. Feb. 27, 2018). As discussed above, disclosure of these practices and policies was not required to prevent affirmative statements made by Defendants from being false or misleading. Whether Defendants were required to disclose the policies and practices as "trends" and sources of "uncertainties" under Section 5(d) of Form 20-F is a closer question, but the Court need not address it because Plaintiffs' clear failure to plead scienter dooms that claim as well. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) ("For Defendants' breach of their Item 303 duty to be actionable under Section 10(b), Plaintiffs were required adequately to plead each element of a 10b-5 securities fraud claim[, including scienter.]"); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (considering whether the plaintiffs plausibly alleged scienter for claims based on omissions that violated Item 303); *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 496 (S.D.N.Y. 2018) (dismissing a claim based on a violation of Item 303 "because the Complaint fails to raise a cogent and compelling inference of scienter"); *see also,*

*e.g.*, *Johnson v. Sequans Commc'ns S.A.*, No. 11-CV-6341 (PAC), 2013 WL 214297, at *11 (S.D.N.Y. Jan. 17, 2013) (noting SEC Guidance that Item 5(D) requires "the same disclosure as Item 303 of Regulation S-K," and applying cases interpreting the "similar language of Item 303" to claims based on Item 5(d)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Section 10(b) and Rule 10b-5 claims must be and are dismissed. It follows that their Section 20(a) claim fails as well. *See, e.g.*, *City of Monroe*, 2011 WL 4357368, at *2 (noting that a Section 20(a) claim requires a successfully pleaded "primary violation by the controlled person" (internal quotation marks omitted)). The Court need not and does not reach Defendants' other arguments for dismissal, including their contention that the Court lacks personal jurisdiction over individual Defendant Mellander. *See, e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013) ("Although we traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues. In cases involving multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, [a court may] proceed[] directly to the merits on a motion to dismiss." (citations and internal quotation marks omitted)).

In a footnote, Plaintiffs request leave to amend. *See* ECF No. 57, at 40 n.16. The Court is skeptical that Plaintiffs will be able to allege additional facts sufficient to cure the defects identified above. Nevertheless, the Court recognizes that there is a strong preference for granting leave to amend in securities cases, such as this one, that involve "a complex commercial reality"

and a "long, multi-prong complaint." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015); *Ong v. Chipotle Mexican Grill, Inc.*, No. 16-CV-141 (KPF), 2017 WL 933108, at*19 (S.D.N.Y. Mar. 8, 2017); *see also* Fed. R. Civ. P. 15(a)(2).

Accordingly, out of an abundance of caution, leave to amend is GRANTED. No further opportunities to amend the Complaint to address the issues raised in the motion to dismiss will be given. Plaintiffs shall file any third amended complaint **within thirty days**.

The Clerk of Court is directed to terminate ECF No. 53.


        SO ORDERED.

Dated:  January 10, 2020
        New York, New York                    _____
                                                JESSE M. FURMAN
                                                United States District Judge